| | | |
|---|---|---|
| Shaun M. Cross | John D. Munding | The Honorable |
| Michael Paukert | Crumb & Munding, P.S. | Patricia C. Williams |
| Gregory J. Arpin | 601 W Riverside | Chapter 11 |
| Paine Hamblen LLP | Ste 1950 | |
| 717 W Sprague Ave | Spokane, WA 99201 | |
| Ste 1200 | (509) 624-6464 Telephone | |
| Spokane, WA 99201 | (509) 624-6155 Facsimile | |
| (509) 455-6000 Telephone | Attorneys for the Executive | |
| (509) 838-0007 Facsimile | Committee of Association of | |
| Attorneys for Debtor | Parishes | |

Joseph E. Shickich, Jr.
George E. Frasier
Riddell Williams P.S.
1001 4th Ave Ste 4500
Seattle WA 98154-1192
(206) 624-3600 Telephone
(206) 389-1708 Facsimile
Attorneys for the Tort
Claimants' Committee

Gayle E. Bush
Bush, Strout & Kornfeld
601 Union St Ste 5500
Seattle WA 98101-2373
(206) 521-3859 Telephone
(206) 292-2104 Facsimile
Attorneys for the Future
Claims Representative

Ford Elsaesser
Elsaesser Jarzabek
Anderson Marks Elliott &
McHugh
123 S Third Street
PO Box 1049
Sandpoint, ID 83864-0855
(509) 263-8517 Telephone
(509) 263-0759 Facsimile
Attorneys for the Executive
Committee of Association of
Parishes

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

| | |
|---|---|
| In re | Case No. 04-08822-PCW-11 |
| THE CATHOLIC BISHOP OF SPOKANE a/k/a THE CATHOLIC DIOCESE OF SPOKANE, | **FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION JOINTLY PROPOSED BY EXECUTIVE COMMITTEE OF THE ASSOCIATION OF PARISHES, DEBTOR, FUTURE CLAIMS REPRESENTATIVE AND TORT CLAIMANTS' COMMITTEE** |
| Debtor. | |

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 1
291/526062.46
030707 1144/62174.00001

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 2

    1.1    Purpose of this Disclosure Statement ................................ 2

    1.2    Abbreviated Plan Summary ................................................ 2

        1.2.1    Purpose of the Plan ............................................. 2

        1.2.2    Funding the Plan ................................................. 3

            1.2.2.1    Liquidation of Debtor's Assets, Contributions by Parishes and Participating Catholic Entities, and Insurance Settlements to Pay Tort Claimants and Professional Fees ................ 3

            1.2.2.2    Payment of Other Claims from Future Income ........................................................... 3

        1.2.3    Allocation of $40 Million among Tort Claimants. .................... 4

            1.2.3.1    Tort Claimants' Choice of Treatment ............... 4

                1.2.3.1.1    Convenience Tort Claimants ................ 4

                1.2.3.1.2    Compromise Tort Claimants ................. 5

                1.2.3.1.3    Settled Compromise Tort Claimants .......................................... 5

                1.2.3.1.4    Matrix Tort Claimants ........................... 5

                1.2.3.1.5    Settled Matrix Tort Claimants ............... 6

                1.2.3.1.6    Litigation Tort Claimants ........................ 7

                1.2.3.1.7    Non-Releasing Litigation Tort Claimants .......................................... 8

            1.2.3.2    Future Tort Claims-Initial ............................ 8

            1.2.3.3    Future Tort Claims-Extended ...................... 9

        1.2.4    Other Claims ................................................... 9

            1.2.4.1    General Unsecured Claims ........................... 9

            1.2.4.2    Priest Retirement Claims ............................. 9

            1.2.4.3    Parish and Catholic Entity Secured and Unsecured Claims ...................................... 10

            1.2.4.4    Ordinary Course Administrative Expense Claims ........................................................ 10

II.    INFORMATION ABOUT THIS DISCLOSURE STATEMENT AND APPROVAL OF THE PLAN ................................................ 10

    2.1    Important Information about this Disclosure Statement ................ 10

04-08822-FPC11   Doc 1773   Filed 03/07/07   Entered 03/07/07 15:05:14   Pg 2 of 32

2.2 Approval of the Plan, and Right to Vote to Accept or Reject the Plan ........................................................................13

2.3 Definitions and Plan Supremacy....................................................14

III. OVERVIEW OF THE PLAN ........................................................................15

3.1 Payment of Tort Claims ....................................................................15

3.1.1 Source of Payments of Tort Claims .................................15

3.1.1.1 $48 Million Debtor's Note ....................................15

3.1.1.1.1 Parishes' Notes...............................15

3.1.1.1.2 Participating Catholic Entities .............17

3.1.1.1.3 Insurance Settlements........................17

3.1.1.2 Commitment to Pay Future Tort Claims ........17

3.1.1.2.1 Future Tort Claims-Initial ...................17

3.1.1.2.2 Future Tort Claims-Extended..............18

3.1.1.2.3 Future Tort Claims Filed after 23th Plan Anniversary Barred.....................19

3.1.1.3 Parishes and Catholic Entity Release of Insurance........................................................19

3.1.2 Allocation of Proceeds of $48 Million Debtor's Note ...........19

3.1.2.1 Estate Fund.............................................19

3.1.2.2 Release Fund............................................20

3.1.3 Right to Distribution from $18.21 Million Estate Fund and $22.54 Million Release Fund to Holders of Tort Claims...............................................................20

3.1.3.1 Right to receive payments from Estate Fund and Release Fund...............................20

3.1.3.1.1 Treatment Election...........................20

3.1.3.1.2 Convenience Tort Claimants ..............20

3.1.3.1.3 Compromise Tort Claimants ...............21

3.1.3.1.4 Settled Compromise Tort Claimants......................................21

3.1.3.1.5 Matrix Tort Claimants.........................21

3.1.3.1.6 Settled Matrix Tort Claimants .............22

3.1.3.1.7 Litigation Tort Claimants ....................22

291/526062.46
030707 1144/62174.00001

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| | 3.1.3.1.8 | Non-Releasing Litigation Tort Claimants | 23 |
| | 3.1.3.1.9 | Release of Claims | 23 |
| | 3.1.3.2 | No Estimate of Distributions for Matrix Tort Claims, Settled Matrix Tort Claims, Litigation Tort Claims and Non-Releasing Litigation Tort Claims | 23 |
| | 3.1.3.3 | Future Tort Claims | 24 |
| 3.1.4 | Establishment of the Plan Trust; Tort Claims Reviewer | | 24 |
| 3.1.5 | All Information about Tort Claimants Confidential | | 25 |
| 3.2 | Payment of Other Allowed Claims | | 26 |

IV.   THE DEBTOR ........................................................................... 27

| 4.1 | Legal Structure of the Debtor | 28 |
|---|---|---|
| 4.2 | Description of the Debtor's Business | 28 |
| 4.3 | History of Debtor Prior to Filing | 28 |
| 4.4 | Pending and Contemplated Litigation | 29 |
| 4.5 | Payments for Services | 29 |
| 4.6 | Management and Compensation | 29 |
| 4.7 | Transactions with Insiders | 30 |
| 4.8 | The Financial Structure and Operations of the Debtor | 30 |
| 4.9 | The Debtor's Assets and Liabilities | 30 |

| | 4.9.1 | Assets | | 30 |
|---|---|---|---|---|
| | | 4.9.1.1 | Disputed and Undisputed Property | 30 |
| | | 4.9.1.2 | Real Property | 31 |
| | | | 4.9.1.2.1 | Appraisal of All Real Property | 31 |
| | | | 4.9.1.2.2 | Undisputed Real Property | 32 |
| | | | 4.9.1.2.3 | Disputed Real Property | 32 |
| | | 4.9.1.3 | Personal Property | 33 |
| | | | 4.9.1.3.1 | Cash | 33 |
| | | | 4.9.1.3.2 | Accounts Receivable | 33 |
| | | | 4.9.1.3.3 | Office Equipment, and Other Tangible Personal Property | 33 |
| | | | 4.9.1.3.4 | Insurance Settlements | 33 |

iii

291/526062.46
030707 1144/62174.00001

# TABLE OF CONTENTS
## (continued)

|  |  |  |  |
|---|---|---|---|
| | 4.9.1.3.5 | Interest of Bishop in Participating Catholic Entities | 33 |
| | 4.9.1.3.6 | Certain Other Corporations | 34 |
| 4.9.2 | Liabilities | | 34 |
| | 4.9.2.1 | Tort Claims | 34 |
| | 4.9.2.2 | Priority Employee Unsecured Claims | 34 |
| | 4.9.2.3 | Priority Unsecured Claims | 35 |
| | 4.9.2.4 | Secured Claims | 35 |
| | 4.9.2.5 | General Unsecured Claims | 35 |
| | 4.9.2.6 | Parish and Catholic Entity Secured and Unsecured Claims | 35 |
| | 4.9.2.7 | Priest Retirement | 35 |
| | 4.9.2.8 | Administrative Expense Claims | 36 |
| | 4.9.2.9 | Unclassified Priority Tax Claims | 36 |
| | 4.9.2.10 | Avoidance Actions | 36 |
| | 4.9.2.10.1 | Paine Hamblen | 36 |
| | 4.9.2.10.2 | Parishes and Catholic Entities | 36 |
| | 4.9.2.10.3 | Unrelated Entities | 36 |
| 4.9.3 | Summary of Assets and Liabilities | | 37 |
| | 4.9.3.1 | Assets | 37 |
| | 4.9.3.2 | Liabilities | 37 |

V.     SIGNIFICANT EVENTS IN CHAPTER 11 ................................................ 38

5.1     The Debtor commenced this Reorganization Case by filing a voluntary Chapter 11 petition on December 6, 2004 ...................... 38

5.2     The Debtor asserted that it did not own the beneficial interest in the Parish Property and the Alleged Restricted Property.......... 38

5.3     The Court entered a Cash Management Order permitting the Debtor, the Parishes and the Catholic Entities to continue to use their bank accounts and cash management system, and to continue to operate in the ordinary course of business ............. 38

5.4     On February 4, 2005, the TLC filed the Section 541 Litigation asserting that the Debtor owns the legal and beneficial interest in the Parish Property, which assertion was supported by the TCC and the FCR ............................................................. 38

iv

291/526062.46
030707 1144/62174.00001

**TABLE OF CONTENTS**
**(continued)**

Page

5.5    The Hon. Gregg Zive, Chief Judge of the United States Bankruptcy Court for the District of Nevada was appointed as a potential mediator of disputes relating to the 541 Litigation and the Plan .................................................................................................. 38

5.6    The Court on August 26, 2005, granted summary judgment in favor of the TLC in the Section 541 Litigation ruling that the Debtor owns the beneficial interest in 22 parcels of the Parish Real Property.................................................................................................. 38

5.7    The Court set a deadline (the Claims Bar Date) of March 10, 2006, for Creditors to file Proofs of Claim ........................................ 38

5.8    The Debtor offered to settle the Tort Claims of 57 Claimants who had filed lawsuits before December 6, 2004, and of 18 Claimants who had not but who were represented by some of the same tort lawyers who represented the 57 Claimants, for $45.7 million, without making provision for the remaining Tort Claims acceptable to the TCC, the FCR, the AOP and other parties in interest .................................................................................. 38

5.9    On June 30, 2006, the District Court reversed the summary judgment in the Section 541 Litigation and remanded the case to the Bankruptcy Court for further proceedings ............................. 39

5.10   The Debtor, the AOP, the TCC, the FCR, the TLC and other parties in interest sought to settle all disputes through mediation before Judge Zive ......................................................... 39

5.11   The Proponents filed their Plan of Reorganization and this Disclosure Statement ......................................................................... 39

VI.    DISTRIBUTIONS UNDER THE PLAN ....................................................... 39

6.1    Distributions on Business Days ........................................................ 39

6.2    Disputed Claims Reserve ................................................................. 39

6.3    Interest on Claims ............................................................................ 40

VII.   EXECUTORY CONTRACTS....................................................................... 40

7.1    Motion to Assume and Reject........................................................... 40

7.2    Rejection Claims............................................................................... 40

VIII.  CONDITIONS TO EFFECTIVE DATE......................................................... 40

8.1    Proponents' Conditions to Occurrence of Effective Date................. 40

       8.1.1    The Confirmation Order has been entered by the Bankruptcy Court and has not been stayed........................ 41

       8.1.2    The Confirmation Order is in form and substance satisfactory to the Proponents and the TLC........................ 41

291/526062.46
030707 1144/62174.00001

# TABLE OF CONTENTS
## (continued)

Page

8.1.3   All actions, documents, and agreements necessary to implement the Plan will have been effected or executed ..... 41

8.1.4   All Insurance Settlements have been approved by the Bankruptcy Court ................................................................... 41

8.2   Insurer's Conditions to Occurrence of Effective Date ..................... 41

8.3   Deadline for Satisfaction of Conditions; Effect of Failure to Satisfy Conditions ................................................................................ 41

IX.   EFFECTS OF CONFIRMATION ................................................................. 41

9.1   Discharge ......................................................................................... 41

9.2   Exculpation and Limitation of Liability ............................................. 42

9.3   Permanent Injunction Against Prosecution of Released Claims ..... 42

9.4   Settling Insurer Injunction ............................................................... 43

9.5   No Release of Other Entities or Policies ......................................... 44

X.   REORGANIZATION OF DEBTOR ............................................................. 45

10.1   Continued Corporate Existence ...................................................... 45

10.2   Management of Reorganized Debtor ................................................ 45

10.3   Parish Reorganization ..................................................................... 45

XI.   NON-MONETARY UNDERTAKINGS OF DEBTOR .................................. 45

11.1   For a period of not less than 9 years after the Effective Date, the Debtor will post on the Diocesan web site the names of ALL known Spokane diocesan clergy, religious clergy not incardinated in the Spokane diocese who nevertheless were functioning as clergy in and for the Spokane diocese, and order clergy or religious who are admitted, proven or credibly accused perpetrators ..................................................................... 46

11.2   Debtor will also continue publication on the web site of the postings of admitted, proven or credibly accused perpetrators described above which have been posted since 2002 for the same period of time as described in Article 26.1 above. ................ 46

11.3   Within one (1) year after the Effective Date, Bishop Skylstad will himself go to every parish in which any children were abused or where perpetrators served and read from the pulpit a statement identifying all perpetrators that have served in the parish and urge people to come forward and contact law enforcement, the diocesan Victim's Assistance Coordinator and/or any survivor group or organization felt appropriate by the person wishing to make a report of abuse. ............................... 46

vi

**TABLE OF CONTENTS**
**(continued)**

Page

11.4 Debtor will publish in the Inland Register four times per year for five (5) years after the Effective Date and one time per year for twenty (20) years thereafter, a prominent statement urging persons sexually abused by priests or religious to come forward and contact law enforcement, and the diocesan Victim's Assistance Coordinator and/or any survivor group or organization felt appropriate by the person wishing to make a report of abuse ...........................................................................47

11.5 Bishop Skylstad will publicly support a complete elimination of all criminal statutes of limitation for child sexual abuse. ................47

11.6 For two (2) years after the Effective Date, the Debtor will allow any person holding an Allowed Tort Claim to speak publicly in the parish where they were Abused at a time mutually agreed upon by the person holding the Allowed Tort Claim, the Debtor and the parish pastor and/or administrator .........................47

11.7 Debtor will make available reasonable space but not more than one full page in each issue of the Inland Register for two (2) years after the Effective Date to allow Tort Claimants to tell their stories of abuse by priests if they desire to publish their stories.......................................................................................47

11.8 Debtor, and its representatives, will not refer either verbally or in print to the Claims of Tort Claimants as "alleged" Claims. ..........47

11.9 Within a reasonable time after the allowance of any Tort Claim, Bishop Skylstad will send letters of apology to the Tort Claimant and, if requested by the Tort Claimant, his or her immediate family.......................................................................47

XII. SATISFACTION AND CANCELLATION OF INDEBTEDNESS ................48

XIII. FEDERAL TAX CONSEQUENCES ..........................................................48

13.1 IN GENERAL.....................................................................................48

13.2 Qualified Settlement Fund ...............................................................49

13.2.1 The Trust is established pursuant to an order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority; .......................................................49

vii

291/526062.46
030707 1144/62174.00001

13.2.2 The Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relates to a case under Title 11 of United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and ........................... 49

13.2.3 The Trust is a trust under Washington state law ................. 49

13.3 Consequences of Characterization as Qualified Settlement Fund ....................................................................................... 50

13.3.1 The Trust must use a calendar taxable year and the accrual method of accounting ............................................... 50

13.3.2 If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust ........ 50

13.3.3 The Trust takes a fair market value basis in property contributed to it by the Debtor. ............................................. 50

13.3.4 The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax .......... 50

13.3.5 The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries ........ 50

13.3.6 The Trust will have a separate taxpayer identification number and shall be required to file annual tax returns (which are due on March 15). The Trust also will be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants ........................................ 50

XIV.    IMPACT ON SSI, MEDICARE, MEDICAID AND OTHER GOVERNMENT BENEFITS ....................................................................... 50

XV.    RISK FACTORS ................................................................................. 51

XVI.    ACCEPTANCE AND CONFIRMATION ............................................. 51

291/526062.46
030707 1144/62174.00001

04-08822-FPC11    Doc 1773    Filed 03/07/07    Entered 03/07/07 15:05:14    Pg 9 of 32

# TABLE OF CONTENTS
## (continued)

Page

| | | | |
|---|---|---|---|
| 16.1 | Voting Procedures | ............................................................. | 51 |
| 16.2 | Hearing on Confirmation | ................................................. | 53 |
| 16.3 | Best Interests of Creditors | ............................................. | 53 |
| 16.4 | Feasibility | ..................................................................... | 53 |
| 16.5 | Treatment of Dissenting Classes of Creditors | ................. | 54 |
| 16.6 | Consequences of the Failure to Confirm the Plan | ........... | 54 |
| XVII. | CONCLUSION | ................................................................ | 54 |

**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE § 1125. IF YOU HAVE REQUESTED AND RECEIVED A COPY OF THE DISCLOSURE STATEMENT IN CONNECTION WITH THE COURT'S HEARING TO CONSIDER APPROVAL OF THE DISCLOSURE STATEMENT, OR HAVE OTHERWISE OBTAINED A COPY OF THIS DISCLOSURE STATEMENT PRIOR TO APPROVAL BY THE BANKRUPTCY COURT, NOTHING CONTAINED HEREIN IS OR SHALL BE DEEMED A SOLICITATION OF ACCEPTANCE OF THE DEBTOR'S PLAN OF REORGANIZATION JOINTLY PROPOSED BY EXECUTIVE COMMITTEE OF THE ASSOCIATION OF PARISHES, DEBTOR, FUTURE CLAIMS REPRESENTATIVE AND TORT CLAIMANTS' COMMITTEE.**

## I. INTRODUCTION

1.1     Purpose of this Disclosure Statement.     The purpose of this Disclosure Statement is to provide Creditors with adequate information to make an informed judgment about the proposed Plan of Reorganization.

1.2     Abbreviated Plan Summary.

1.2.1     Purpose of the Plan.  The purpose of the Plan is to pay fair compensation to persons who were sexually Abused (who are called "Tort Claimants"), to pay other Creditors what they were owed when the bankruptcy case was filed (which are called "Other Claims"), to pay the expenses of the bankruptcy (primarily Claims for "Professional Fees"[1] of attorneys and accountants), and to provide for non-monetary measures by the Debtor addressing sexual abuse of children.  Subject to the provisions of the Plan, the

---

[1] Professional Fees also are referred to as "Administrative Expense Claims for Professional Fees".

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 2
291/526062.46
030707 1144/62174.00001

Debtor intends to preserve and advance the mission and ministries of the Catholic Church within the Catholic Diocese of Spokane

      1.2.2   Funding the Plan.

          1.2.2.1   Liquidation of Debtor's Assets, Contributions by Parishes and Participating Catholic Entities, and Insurance Settlements to Pay Tort Claimants and Professional Fees.  The Debtor will raise $48 million from liquidation of its assets as necessary, insurance settlements, and contributions by the Parishes and certain other Participating Catholic Entities[2] to pay Tort Claims an amount estimated to be no less than $40 million, Plan Trust Costs and Expenses incurred in determining Tort Claims estimated to be no more than $1 million,[3] and unpaid Professional Fees of approximately $7 million.[4]  The Debtor's future income also is available to pay these Claims if necessary.  In addition, the Debtor will provided insurance for, and the Debtor and certain Parishes in FTC Parish Groups 1 and 2 will pay, certain Allowed Future Tort Claims.

          1.2.2.2   Payment of Other Claims from Future Income.  Approximately $262,775 per month of pre-confirmation Ordinary Course Administrative Expense Claims and post-confirmation ordinary course expenses for the Debtor's day to day operating expenses, approximately $18,000 of General Unsecured Claims, and approximately $25,000 per month for current Priest Retirement Claims will be paid from the Debtor's future income, and not from

---

[2] The Participating Catholic Entities are Catholic Cemeteries of Spokane, Morning Star Boys' Ranch, Immaculate Heart Retreat Center, and Catholic Charities of Spokane.

[3] Plan Trust Costs and Expenses could equal or exceed $1 million, although Proponents believe they are unlikely to exceed $1 million and might well be no more than $500,000.

[4] Proponents estimate that unpaid Professional Fees as of December 31, 2006 and future Professional Fees will total $7 million.  This includes approximately $1,8 million paid by Debtor on our about January 31, 2007 which will be deducted from the $48 million amount payable by Debtor. There is no guaranty that such Professional Fees will not exceed $7 million.  It is possible that the Bankruptcy Court may reduce the amount of such Professional Fees.  A schedule of unpaid Professional Fees as of December 31, 2006 is attached as Exhibit 2.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 3
291/526062.46
030707 1144/62174.00001

liquidation of its assets, insurance settlements, or contributions by the Parishes and certain other Participating Catholic Entities before December 31, 2007, by which date the Debtor is required to pay at least $47 million for Tort Claimants and Professional Fees. No Deposit and Loan Claims shall be paid before this $47 million is paid.

    1.2.3  <u>Allocation of $40 Million among Tort Claimants</u>.

        1.2.3.1  <u>Tort Claimants' Choice of Treatment</u>. Tort Claimants who have settled their Claims and whose settlements are approved by the Bankruptcy Court will be treated as Settled Compromise Tort Claimants or Settled Matrix Tort Claimants.[5] A Tort Claimant who has not settled his or her Claim must choose how he or she wants to be treated under the Plan from 5 choices: as a Convenience Tort Claimant, a Compromise Tort Claimant, a Matrix Tort Claimant, a Litigation Tort Claimant, or a Non-Releasing Litigation Tort Claimant. It is impossible to predict which or how many Tort Claimants will elect a particular treatment option.

        1.2.3.1.1  <u>Convenience Tort Claimants</u>. A Convenience Tort Claimant is a Tort Claimant who elects to take $15,000 for the Claim, and gives a Release of Claims. The Claimant only needs to prove to an independent tort claims reviewer ("TCR") by a preponderance of the evidence that the Claimant was Abused. The TCR will not consider (i) whether the person who Abused the Tort Claimant was a Responsible Person, (ii) any applicable statute of limitations or the passage of time since the date(s) of such Abuse, or (iii) any other defenses of Debtor, in making such determination. The Claim will be paid approximately 90 days after the Bankruptcy Court approves the Plan.

---

[5] A Tort Claimant whose settlement is not approved by the Bankruptcy Court may elect to be treated as a Convenience Tort Claimant, a Compromise Tort Claimant, a Matrix Tort Claimant, a Litigation Tort Claimant, or a Non Releasing Litigation Tort Claimant.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 4
291/526062.46
030707 1144/62174.00001

1.2.3.1.2 <u>Compromise Tort Claimants</u>. A Compromise Tort Claimant is a Tort Claimant who elects to take $45,000 for the Claim ($30,000 if the Claimant was an adult at the time of such Abuse), and gives a Release of Claims.[6] The Claimant must prove to the TCR by a preponderance of the evidence that the Claimant was Abused by a person who was a Priest, an employee or other agent of the Debtor or any Parish, or for whom or for whose actions the Debtor or any Parish was otherwise legally liable, at the time such person committed the Abuse (a "Responsible Person"), and that such Abuse involved physical contact. The TCR will not consider (i) any applicable statute of limitations or the passage of time since the date(s) of such Abuse, or (ii) any other defenses of Debtor, in making such determination. The Claim will be paid approximately 180 days after the Bankruptcy Court approves the Plan.

1.2.3.1.3 <u>Settled Compromise Tort Claimants</u>. A Settled Compromise Tort Claimant is a Tort Claimant who has agreed with the Debtor to settle the Claim for $45,000 or less,[7] and gives a Release of Claims. There are 29 Settled Compromise Tort Claims totaling $614,800. The Claim is Allowed automatically in the agreed amount and will be paid approximately 90 days after the Bankruptcy Court approves the Plan.

1.2.3.1.4 <u>Matrix Tort Claimants</u>. A Matrix Tort Claimant is a Tort Claimant who elects to have the TCR determine where his or her Claim should be placed relative to other Claims in a Matrix[8] with 4 tiers ranging from $15,000 to $74,999 in the lowest tier to $750,000 to $1,500,000 in the highest

---

[6] A Compromise Tort Claimant may amend his or her election to elect Convenience Tort Claim treatment at any time prior to final allowance or disallowance of his or her Claim.

[7] Settled Compromise Tort Claims are listed in Schedule 11.1.2(a) of the Plan. Each settlement must by approved by the Bankruptcy Court. If a settlement is not approved, the Claimant may elect treatment as a Convenience, Compromise, Matrix, Litigation or Non-Releasing Litigation Tort Claimant.

[8] The Matrix is attached to the Plan as Schedule 2.83.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 5
291/526062.46
030707 1144/62174.00001

tier based on all of the facts and circumstances of their Abuse, and gives a Release of Claims.[9]  The Claimant must prove to the TCR by a preponderance of the evidence that he or she was Abused by a Responsible Person.  His or her Claim may be disallowed if the TCR finds that there is clear, cogent and convincing evidence that the applicable statute of limitations had run on or before December 6, 2004.  Matrix Tort Claimants, along with Settled Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants, will be paid their pro rata share of the funds remaining after payment of Convenience Tort Claimants, Compromise Tort Claimants and Settled Compromise Tort Claimants in full.  It is impossible to predict the amount that will be Allowed for the Claims of Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants, or what the pro rata share of an individual Matrix Tort Claimant will be.  Because no Matrix Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed, such Claims may not be paid until approximately 1 year after the Bankruptcy Court approves the Plan. There is no guarantee that Matrix Tort Claims will be paid in full.

> 1.2.3.1.5   <u>Settled Matrix Tort Claimants</u>.  A Settled Matrix Tort Claimant is a Tort Claimant who has agreed with the Debtor to settle the Claim for more than $45,000,[10] and gives a Release of Claims.  The Claim is Allowed automatically in the agreed amount.  There are 7 Settled Matrix Tort Claims which total $1,128,000, or approximately $161,000 per Claimant.  Settled Matrix Tort Claimants, along with Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants, will be paid their pro rata share of

---

[9] A Matrix Tort Claimant may amend his or her election to elect Convenience or Compromise Tort Claim treatment at any time prior to final allowance or disallowance of his or her Claim.

[10] Settled Matrix Tort Claims are listed in Schedule 11.1.2(b) of the Plan.  If the settlement is not approved, the Claimant may elect treatment as a Convenience, Compromise, Matrix, Litigation or Non-Releasing Litigation Tort Claimant.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 6
291/526062.46
030707 1144/62174.00001

the funds remaining after payment of Convenience Tort Claimants, Compromise Tort Claimants and Settled Compromise Tort Claimants in full. It is impossible to predict what the pro rata share of an individual Settled Matrix Tort Claimant will be. Because no Settled Matrix Tort Claims will be paid until all Matrix Tort Claims have been finally Allowed or Disallowed, such Claims may not be paid until approximately 1 year after the Bankruptcy Court approves the Plan. There is no guarantee that Settled Matrix Tort Claims will be paid in full.

> 1.2.3.1.6  <u>Litigation Tort Claimants</u>. A Litigation Tort Claimant is a Tort Claimant who elects to have his or her Claim determined in a court trial with a right to a jury, and gives a Release of Claims.[11] Litigation Tort Claimants must prove all elements of their Claim and their Claims are subject to all defenses the Debtor may have.[12] Litigation Tort Claimants, along with Matrix Tort Claimants, Settled Matrix Tort Claimants, and Non-Releasing Litigation Tort Claimants, will be paid their pro rata share of the funds remaining after payment of Convenience Tort Claimants, Compromise Tort Claimants and Settled Compromise Tort Claimants in full. It is impossible to predict the amount that will be Allowed for the Claims of Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants, or what the pro rata share of an individual Litigation Tort Claimant will be. Because no Litigation Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed, such Claims may not be paid until approximately 2-4 years after the Bankruptcy Court approves the Plan. There is no guarantee that Litigation Tort Claims will be paid in full.

---

[11] A Litigation Tort Claimant may amend his or her election to elect Convenience, Compromise or Matrix Tort Claim treatment at any time prior to the earliest of the date on which the Plan Trustee has filed a dispositive motion with respect to, or trial has commenced on, the Claim.

[12] The Plan Trustee is responsible for handling Litigation Tort Claims and Non-Releasing Litigation Tort Claims, and will succeed to all of Debtor's defenses to such Claims.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 7
291/526062.46
030707 1144/62174.00001

1.2.3.1.7 Non-Releasing Litigation Tort Claimants. A Non-Releasing Litigation Tort Claimant is a Tort Claimant who elects to have his or her Claim determined in a court trial with a right to a jury, and does not give a Release of Claims. Non-Releasing Litigation Tort Claimants must prove all elements of their Claim and their Claims are subject to all defenses the Debtor may have.[13] They will not share in a fund of approximately $22.54 million paid by the Parishes, the Participating Catholic Entities and the Insurers for Releases of Claim. Non-Releasing Litigation Tort Claimants, along with Matrix, Settled Matrix and Litigation Tort Claimants, will be paid their pro rata share of the other funds remaining after payment of Convenience Tort Claimants, Compromise Tort Claimants and Settled Compromise Tort Claimants in full. It is impossible to predict the amount that will be Allowed for the Claims of Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants, or what the pro rata share of an individual Non-Releasing Litigation Tort Claimant will be. Because no Non-Releasing Litigation Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed, such Claims may not be paid until approximately 2-4 years after the Bankruptcy Court approves the Plan. Because Non-Releasing Litigation Tort Claimants will not share approximately $22.54 million paid by the Parishes, the Participating Catholic Entities and the Insurers for Releases of Claim, it is highly unlikely that these Claims will be paid in full.

1.2.3.2 Future Tort Claims-Initial. $1 million will be set aside for Future Tort Claims-Initial (those filed on or before the 9th Anniversary of the Plan) . Future Tort Claims-Initial in excess of $1 million will be paid by the Debtor, the Debtor's continuing insurance, and certain Parishes.

---

[13] A Non-Releasing Litigation Tort Claimant may amend his or her election to elect Convenience, Compromise or Matrix Tort Claim treatment at any time prior to the earliest of the date on which the Plan Trustee has filed a dispositive motion with respect to, or trial has commenced on, the Claim.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 8
291/526062.46
030707 1144/62174.00001

1.2.3.3  <u>Future Tort Claims-Extended</u>.  Future Tort Claims-Extended (those filed after the 9th and on or before the 23rd Anniversary of the Effective Date) will be paid by the Debtor from the Debtor's continuing insurance.

1.2.4  <u>Other Claims</u>.  The only material Other Claims are Ordinary Course Administrative Expense Claims, Parish and Catholic Entity Secured and Unsecured Claims (including Deposit and Loan Claims), General Unsecured Claims and Priest Retirement Claims.

1.2.4.1  <u>General Unsecured Claims</u>.  The Proponents estimate that General Unsecured Claims of approximately $256,439 will be allowed. [14]  Each holder of an Allowed General Unsecured Claim will be paid in full in Cash by the Reorganized Debtor in 2 equal installments, plus interest at the rate of 5% per annum, with the first installment to be paid approximately 11 months after the Plan is approved by the Bankruptcy Court and the second installment to be paid 6 months later.

1.2.4.2  <u>Priest Retirement Claims</u>.  Priest Retirement Claims with an approximate present value of $4.5 million were scheduled by the Debtor. Each holder of an Allowed Priest Retirement Claim shall be paid on an on-going basis by the Reorganized Debtor in accordance with the Priest Retirement Plan, as it may be amended from time to time or as it may be replaced by another retirement plan with the approval of the Presbyterate and Presbyteral Council. Only current monthly retirement payments may be paid until the $48 million Debtor's Note is paid in full.  Net of contributions from other sources and pursuant to the Budget attached as Exhibit 1, the Debtor is currently paying out of operating

---

[14] Includes General Unsecured Convenience Claims of approximately $17,869, which will be paid approximately 30 days after the Plan is approved.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 9
291/526062.46
030707 1144/62174.00001

revenues approximately $25,000 per month to meet its priest retirement obligations.

           1.2.4.3   <u>Parish and Catholic Entity Secured and Unsecured Claims</u>. All Parish and Catholic Entity Secured and Unsecured Claims except Deposit and Loan Claims will be disallowed. Deposit and Loan Claims of approximately $4.2 million will be Allowed. Allowed Deposit and Loan Claims will be paid from the proceeds of DLF Loans, but shall not be paid in full or in part or offset against the DLF Loans or proceeds thereof before the date on which the October 1, 2007 $37 million payment and the December 31, 2007 $10 million plus interest payment on Debtor's Note are paid in full when due. The proceeds of the DLF Loans and the balance of Allowed Deposit and Loan Claims in excess of such proceeds shall be paid in accordance with an agreement between Reorganized Debtor and the Parishes and Catholic Entities to be negotiated outside the Plan.

           1.2.4.4   <u>Ordinary Course Administrative Expense Claims</u>. Pre-confirmation Ordinary Course Administrative Expense Claims of approximately $262,775 per month are being paid currently by Debtor.

## II. INFORMATION ABOUT THIS DISCLOSURE STATEMENT AND APPROVAL OF THE PLAN

    2.1   **Important Information about this Disclosure Statement**.

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION ("PLAN") PROPOSED BY THE EXECUTIVE COMMITTEE OF THE ASSOCIATION OF PARISHES ("AOP"),[15] THE CATHOLIC BISHOP OF**

---

[15] The Association of Parishes is an unincorporated association of the Parishes contained within the Diocese of Spokane. The Executive Committee of the Association of Parishes consists of four lay Parishes' representatives and four clergy (one of whom is now deceased). The Executive Committee of the Association of Parishes has no power or authority over any Parishes, but rather, acted as a facilitator to inform the Parishes of their rights, obligations, and potential liabilities in conjunction with this Case, related litigation, and the Plan. The Executive Committee of the

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 10
291/526062.46
030707 1144/62174.00001

1  SPOKANE AKA THE CATHOLIC DIOCESE OF SPOKANE ("DEBTOR"), THE

2  FUTURE CLAIMANTS REPRESENTATIVE ("FCR") AND TORT CLAIMANTS'

3  COMMITTEE ("TCC") (TOGETHER "PROPONENTS") FOR THE DEBTOR.

4  THIS DISCLOSURE STATEMENT WAS PREPARED BY THE PROPONENTS.

5  PLEASE READ IT WITH CARE.  IT SUMMARIZES THE TERMS OF THE PLAN

6  AND CONTAINS FINANCIAL AND OTHER INFORMATION ABOUT THE

7  DEBTOR.

8      THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  THIS

9  DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN WHICH IS

10  ATTACHED AS EXHIBIT 2, SHOULD BE READ COMPLETELY.  FOR THE

11  CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS

12  DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER

13  STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY

14  BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY

15  INCONSISTENCY.

16      CERTAIN MATERIALS CONTAINED IN THIS DISCLOSURE

17  STATEMENT ARE TAKEN DIRECTLY FROM OTHER, READILY ACCESSIBLE

18  DOCUMENTS OR ARE DIGESTS OF OTHER DOCUMENTS.  WHILE EVERY

19  EFFORT HAS BEEN MADE TO RETAIN THE MEANING OF SUCH

20  DOCUMENTS, YOU ARE URGED TO RELY UPON THE CONTENTS OF SUCH

21  DOCUMENTS ONLY AFTER A THOROUGH REVIEW OF THE DOCUMENTS

22  THEMSELVES.  SUCH DOCUMENTS WILL BE PROVIDED BY DEBTOR ON

23  REQUEST.

24

25  Association of Parishes can be contacted in care of counsel for same, identified on the face of this
   Disclosure Statement.  The Co-chair of the Executive Committee of the Association of Parishes is
26  Fr. Michael J. Savelesky, who can be contacted via said counsel.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 11
291/526062.46
030707 1144/62174.00001

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, THE PARISHES, OR OTHER CATHOLIC ENTITIES, INCLUDING, WITHOUT LIMITATION, THEIR OPERATIONS, THE VALUE OF THEIR ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR, THE PARISHES, OR OTHER CATHOLIC ENTITIES ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE PROPONENTS ONLY AND IT IS NOT A SOLICITATION BY THE PROPONENTS' ATTORNEYS OR ANY OTHER PROFESSIONALS.

UNLESS OTHERWISE NOTED, FINANCIAL AND OTHER INFORMATION CONTAINED HEREIN HAS BEEN OBTAINED FROM THE DEBTOR'S RECORDS, INCLUDING ITS SCHEDULES OF ASSETS AND LIABILITIES, ITS STATEMENT OF FINANCIAL AFFAIRS, ITS MONTHLY FINANCIAL STATEMENTS, AND FROM CLAIMS FILED BY CREDITORS IN THIS CASE. THE DEBTOR HAS INFORMED THE OTHER PROPONENTS THAT IT BELIEVES THAT REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL OF ITS RECORDS. HOWEVER, THE DEBTOR STATES THAT IT IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

ACCORDINGLY, PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE FINANCIAL AND OTHER INFORMATION CONTAINED HEREIN IS WITHOUT ERROR, AND CAUTION CREDITORS THAT SOME OF THE INFORMATION PROVIDED HEREIN MAY BE SUBJECT TO CHANGE.

2.2    <u>Approval of the Plan, and Right to Vote to Accept or Reject the Plan</u>.
This Disclosure Statement is submitted by Proponents in accordance with
Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Plan from
holders of Tort Claims, Parish and Catholic Entity Secured and Unsecured Claims,
and General Unsecured Claims.[16]  It has been approved by the Bankruptcy Court
as containing information of a kind, and in sufficient detail, which is adequate to
enable a hypothetical reasonable creditor to make an informed judgment whether
to vote to accept or to reject the Plan.

The Bankruptcy Court will hold a hearing on confirmation ("confirmation" is
the bankruptcy term for "approval") of the Plan beginning at 9:00 a.m. on April 24,
2007 before the Honorable Patricia C. Williams, United States Bankruptcy Judge,
in Courtroom 327, United States Bankruptcy Court, 901 West Riverside Avenue,
Spokane, Washington, 99201.  The Confirmation Hearing may be adjourned from
time to time without further written notice.

In determining whether the Plan should be confirmed, the Bankruptcy Court
will consider whether the Plan satisfies the requirements of §1129 of the
Bankruptcy Code, including whether it is feasible and whether it is in the best
interests of the holders of Claims.  The Bankruptcy Court also will receive and
consider a ballot report prepared by the Proponents concerning the votes for
acceptance or rejection of the Plan by parties entitled to vote.  Holders of Tort
Claims, Parish and Catholic Entity Secured and Unsecured Claims, and General
Unsecured Claims are grouped in separate Classes which vote separately.

---

[16] These are the only Claims that are "impaired" ( a Claim is impaired if the Claimant will not be
paid in full or its rights are otherwise modified, as more fully defined in §1124 of the Bankruptcy
Code), and that therefore have a right to vote to approve or reject the Plan.  All other Claims are
unimpaired (i.e., the rights of the holder have not been modified) and do not have a right to vote.
See §1124 of the Bankruptcy Code for further details.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 13
291/526062.46
030707 1144/62174.00001

In order for a Class of Claims to accept the Plan, ballots representing at least two-thirds in amount and more than one-half in number of those who vote in that Class must be cast in favor of the Plan. For voting purposes only, the Bankruptcy Court has set the value of each Claim held by a Tort Claimant at $1, and all Tort Claimants whose claims have not been Disallowed by a Final Order will be entitled to vote. Bankruptcy Code § 1129(b) provides that, if the Plan is not accepted by one or more impaired classes of Claims, the Plan nevertheless may be confirmed by the Bankruptcy Court, if (i) the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable with respect to the non-accepting Class(es) of Claims that are impaired under the Plan; and (ii) at least one Class of impaired Claims has voted to accept the Plan. Proponents have requested that the Court confirm the Plan even if the Plan is not accepted by one or more impaired classes of Claims.

**IT IS IMPORTANT THAT YOU VOTE. THE PROPONENTS BELIEVE THAT A VOTE FOR ACCEPTANCE OF THE PLAN IS IN YOUR BEST INTEREST, AND RESPECTFULLY REQUEST THAT YOU VOTE IN FAVOR OF THE PLAN.**

2.3  <u>Definitions and Plan Supremacy</u>.  All terms defined in the Plan shall have the same meanings when used in this Disclosure Statement. Capitalized terms which are not defined in the Plan or this Disclosure Statement are defined in §§ 101 and 1101 of the Bankruptcy Code and Bankruptcy Rule 9001. Terms defined in this Disclosure Statement which are also defined in the Plan or the Bankruptcy Code or Rules are so defined solely for convenience; and the Proponents do not intend to change the definitions of those terms from the Plan or the Bankruptcy Code or Rules. Furthermore, in the event of any inconsistency between the Plan and this Disclosure Statement, the Plan shall control. The

Exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### III. OVERVIEW OF THE PLAN

3.1    Payment of Tort Claims.

3.1.1    Source of Payments of Tort Claims.  Allowed Tort Claims, including Allowed Future Tort Claims, will be paid from the proceeds of a $48 million Debtor's Note and a Payment Agreement as follows:

3.1.1.1    $48 Million Debtor's Note.  On the Effective Date, a $48 million Debtor's Note payable in installments of $37 million on or before October 1, 2007, $10 million on or before December 31, 2007 and $1 million on or before October 1, 2009 and secured by Debtor's Collateral, which is substantially all of the assets of the Reorganized Debtor, shall be delivered to the Plan Trust. The Collateral shall include a $10 million Parishes' Note 1, a $5 million Parishes' Note 2, a $1 million Parish Note 3, $6.4 million in Cash and other property from the Participating Catholic Entities, and approximately $19.8 million plus accruing interest in Insurance Settlements.

3.1.1.1.1    Parishes' Notes.  On the Effective Date, the Parishes shall purchase all of the Debtor's interest in certain real property to which the Debtor holds record title and personal property used by the Parishes in conjunction with such real property ("Parish Property")[17] for $14 million paid by certain Parishes to be allocated to the Estate Fund.[18]  Certain Parishes also shall pay Reorganized Debtor an additional $2 million to be allocated to the Release Fund[19] for a Release of Claims from each holder of a Tort Claim who elects to

---

[17] The Section 541 Litigation alleges that the Debtor is the owner of this property.  The Debtor and the Parishes allege that the Parishes are the owners.
[18] This is the Estate's Portion of Parishes' Notes.
[19] This is the Release Portion of Parishes' Notes.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 15
291/526062.46
030707 1144/62174.00001

receive funds paid for such Releases of Claim. The total $16 million obligation shall be evidenced by a $10 million Parishes' Note 1 executed by all of the Participating Parishes jointly and severally payable on or before December 31, 2007, a $5 million Parishes' Note 2 executed by the Note 2 Parishes[20] jointly and severally payable on or before October 1, 2007, and a $1 million Parish Note 3 executed by the Note 3 Parish[21] jointly and severally payable on or before October 1, 2009, (collectively the Parishes' Notes"). Each Participating Parish shall execute, acknowledge as necessary, and deliver to the Plan Trustee a Deed of Trust and Security Agreement ("Parish DOT") on the portion of such Parish's Parish Property which is real property, fixtures and intangible personal property such as permits, plans, service contracts and warranties related to such real property and fixtures then owned and thereafter acquired ("Parish Collateral") to secure payment of the Parishes' Note 1. Participating Parishes have committed to raising or borrowing funds to pay Parishes' Note 1, plus interest accruing after October 1, 2007, on or before December 31, 2007, but their obligation to pay Parishes' Note 1 is not conditioned on the success of such fund raising or borrowing. The Parish DOTs of the Note 2 Parishes also shall secure Parishes' Note 2. The Reorganized Debtor has committed to raising or borrowing funds to pay Parishes' Note 2 on or before October 1, 2007, but the obligation of the Note 2 Parishes to pay Parishes' Note 2 is not conditioned on the success of such fund raising or borrowing. The Parish DOT of the Note 3 Parish also shall secure Parish Note 3. The Reorganized Debtor has committed to raising or borrowing funds to pay Parish Note 3 on or before October 1, 2009, but the obligation of the

---

[20] The Note 2 Parishes are identified in Schedule 15.4.3.1.2 of the Plan.
[21] The Note 3 Parish is Our Lady of Lourdes Parish and its Parish Entity. Parish Entities are legal entities to be formed by Parishes for the purpose of holding title to and/or beneficial interests in the Parish's assets

04-08822-FPC11    Doc 1773    Filed 03/07/07    Entered 03/07/07 15:05:14    Pg 25 of 32

Note 3 Parish to pay Parish Note 3 is not conditioned on the success of such fund raising or borrowing. Under no circumstances do Parishes' Notes 1, 2, or 3 create any legal liability or obligation for individual parishioners.

3.1.1.1.2 <u>Participating Catholic Entities</u>. On the Effective Date, the Participating Catholic Entities shall purchase all of the Debtor's interest in certain property used by the Participating Catholic Entities, and all of the Debtor's interest in the Guse Trust (which Debtor believes can not be used to pay Claims) ("Catholic Entity Property")[22] for $5,657,500 in Cash and other property to be allocated to the Estate Fund,[23] and shall pay Reorganized Debtor an additional $742,500 in Cash and other property to be allocated to the Release Fund[24] for a Release of Claims from holders of Tort Claims who elect to receive funds for such Releases of Claim.

3.1.1.1.3 <u>Insurance Settlements</u>. The Insurers will pay Debtor approximately $19.8 million in Insurance Settlements to be allocated to the Release Fund for a Release of Claims from each holder of a Tort Claim who elects to receive funds paid for such Releases of Claim.

3.1.1.2 <u>Commitment to Pay Future Tort Claims</u>.

3.1.1.2.1 <u>Future Tort Claims-Initial</u>. On the Effective Date, Reorganized Debtor and FTC Parish Group 1 and Group 2[25] shall execute and deliver to the Plan Trustee a Payment Agreement undertaking to pay all Future Tort Claims filed on or before the 9th anniversary of the Effective Date ("Future Tort Claims-Initial") and all Plan Trust Costs and Expenses with respect to

---

[22] The Section 541 Litigation alleges that the Debtor is the owner of this property. The Debtor and the Participating Catholic Entities allege that the Participating Catholic Entities are the owners.
[23] This is the Estate's Portion of Catholic Entities Payments.
[24] This is the Release Portion of Catholic Entities Payments.
[25] FTC Parish Group 1 and Group 2 Parishes are identified in Schedules 15.9(a) and (b) of the Plan.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 17
291/526062.46
030707 1144/62174.00001

Future Tort Claims-Initial in excess of $1 million. The Payment Agreement shall be secured by the FC DOTs on the Debtor's Collateral, the Parish Group 1 Collateral and the Parish Group 2 Collateral. The FC DOTs shall be subordinate to the security interests provided for in the Debtor's DOT and the Parishes' DOTs. The FC DOTs on the FTC Parish Group 2 Collateral shall be subordinated to any security interests granted by the FTC Parish Group 2 to secure a loan or loans not to exceed the then outstanding balance of the Parishes' Notes the proceeds of which are used exclusively to pay the Parishes' Notes in full. The FC DOTs on the FTC Parish Group 1 Collateral and the Debtor's Collateral shall not be subordinated to any such security interests. The Reorganized Debtor also shall continue to insure for Tort Claims caused by acts committed on or after February 1, 1989 with Catholic Mutual, its successor, or another insurer, under insurance policies equivalent to its current insurance policies with Catholic Mutual, until all Future Tort Claims-Initial have been determined by a Final Order and all Allowed Future Tort Claims-Initial and all Plan Trust Costs and Expenses with respect to Future Tort Claims-Initial have been paid in full. The provisions referred to in this Article 3.1.1.2.1 are referred to collectively as the "Future Claims Commitment". As consideration for the Future Claims Commitment, Debtor and the Parishes shall receive a Release of Claims from each holder of a Tort Claim who elects to receive funds paid for such Releases of Claim.

        3.1.1.2.2   <u>Future Tort Claims-Extended</u>. The Reorganized Debtor also shall continue to insure for Future Tort Claims filed after the 9th anniversary of the Effective Date and on or before the 23rd anniversary of the Effective Date ("Future Tort Claims-Extended") caused by acts committed on or after January 1, 1989 under insurance policies with Catholic Mutual, its successor, or another insurer, under insurance policies equivalent to its current

insurance policies with Catholic Mutual, until all Future Tort Claims-Extended have been determined by a Final Order and all Allowed Future Tort Claims-Extended and all Plan Trust Costs and Expenses with respect to Future Tort Claims-Extended have been paid in full, which obligation shall continue to be secured by the Debtor's FC DOT. If, on the 9th Anniversary of the Effective Date, the Reorganized Debtor does not have such insurance in full force and effect, the Parishes in Parish Group 1, jointly and severally with the Reorganized Debtor, will be obligated under the Payment Agreement to continue insurance for Future Tort Claims-Extended, which obligation shall continue to be secured by the FC DOTs of the Parishes in Parish Group 1.

            3.1.1.2.3   <u>Future Tort Claims Filed after $23^{th}$ Plan Anniversary Barred</u>. All Future Tort Claims filed after the 23rd anniversary of the Effective Date shall have no right to payment or any other right under the Plan, and all such Claims shall be discharged under the Plan.

            3.1.1.3   <u>Parishes and Catholic Entity Release of Insurance</u>. On the Effective Date the Parishes and the Catholic Entities (except Morning Star Boys' Ranch) shall release their claims to coverage under the insurance policies covered by the Insurance Settlements in consideration of entry of the Permanent Injunction and receipt of Releases of Claims from each holder of a Tort Claim who elects to receive funds paid for such Releases of Claim.

            3.1.2   <u>Allocation of Proceeds of $48 Million Debtor's Note</u>.

            3.1.2.1   <u>Estate Fund</u>. The $14 million Estate's Portion of Parishes Note, the $5,657,500 Estate's Portion of Catholic Entity Payments and payments of approximately $5.55 million from Debtor's property and future income shall be allocated to the Estate Fund, and Allowed Administrative Expense Claims for Professional Fees incurred on or before the Effective Date which were unpaid

on September 14, 2006 now estimated at $7 million shall be deducted before such amounts are allocated to the Estate Fund. The amount of the Estate Fund is estimated to be approximately $18,207,500.

3.1.2.2 <u>Release Fund</u>. The $2 million Release Portion of Parishes Note, the $742,500 Release Portion of Catholic Entity Payments and the approximately $19.8 million Insurance Settlements shall be allocated to the Release Fund. The amount of the Release Fund is estimated to be approximately $22,542,500.

3.1.3 <u>Right to Distribution from $18.21 Million Estate Fund and $22.54 Million Release Fund to Holders of Tort Claims</u>.

3.1.3.1 <u>Right to receive payments from Estate Fund and Release Fund</u>.

3.1.3.1.1 <u>Treatment Election</u>. A Tort Claimant who has not settled his or her Claim must choose how he or she wants to be treated under the Plan from 5 choices: as a Convenience Tort Claimant, a Compromise Tort Claimant, a Matrix Tort Claimant, a Litigation Tort Claimant, or a Non-Releasing Litigation Tort Claimant. Tort Claimants who have settled their Claims and whose settlements are approved by the Bankruptcy Court will be treated as Settled Compromise Tort Claimants or Settled Matrix Tort Claimants.

3.1.3.1.2 <u>Convenience Tort Claimants</u>. A Convenience Tort Claimant shall be paid $15,000 if the Tort Claims Reviewer ("TCR") determines based on the Tort Claimant's proof of claim in the Bankruptcy Case and, if requested by the TCR, the Tort Claimant's Questionnaire by a preponderance of the evidence that the Claimant was Abused. The TCR shall not consider (i) whether the person who Abused the Tort Claimant was a Responsible Person, (ii) any applicable statute of limitations or the passage of time since the

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 20
291/526062.46
030707 1144/62174.00001

date(s) of such Abuse, or (iii) any other defenses of Debtor, in making such determination. Convenience Tort Claimants shall be paid from the Convenience Fund, which is a portion of the Estate Fund and the Release fund.

       3.1.3.1.3 <u>Compromise Tort Claimants</u>.  A Compromise Tort Claimant shall be paid $45,000 if the TCR determines by a preponderance of the evidence that the holder of such Claim was a minor at the time of such Abuse, and in the amount of $30,000 if the TCR determines by a preponderance of the evidence that the holder of such Claim was an adult at the time of such Abuse.  The Claimant must show by a preponderance of the evidence that he or she was Abused by a Responsible Person, and that such Abuse involved physical contact.  The TCR shall not consider any applicable statute of limitations, the passage of time since the date(s) of such Abuse, or any other defenses of Debtor, in making such determination.  Compromise Tort Claimants shall be paid from the Compromise Fund, which is a portion of the Estate Fund and the Release fund.

       3.1.3.1.4 <u>Settled Compromise Tort Claimants</u>.   A Settled Compromise Tort Claimant shall be automatically paid in the amount of $45,000 or less listed for the Claimant's Claim in Schedule 11.1.2(a) of the Plan. The Claimant does not need to give any proof of his or her Claim, and the Claim is not subject to any applicable statute of limitations, any defense based on the passage of time since the date(s) of the Claimant's Abuse, or any other defenses of Debtor.  Settled Tort Claimants shall be paid from the Compromise Fund, which is a portion of the Estate Fund and the Release fund.

       3.1.3.1.5 <u>Matrix Tort Claimants</u>.  Matrix Tort Claimants shall be paid their pro rata share of the Matrix Fund, which is a portion of the Estate Fund and the Release fund.  The amount of a Matrix Tort Claimant's

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 21
291/526062.46
030707 1144/62174.00001

Claim shall be determined according to a Matrix with 4 tiers ranging from $15,000 to $74,999 in the lowest tier to $750,000 to $1,500,000 in the highest tier based on all of the facts and circumstances of their Abuse. They must show by a preponderance of the evidence that they were Abused by a Responsible Person. Their Claim may be disallowed if the TCR finds that there is clear, cogent and convincing evidence that the applicable statute of limitations had run on or before December 6, 2004. The TCR shall not consider any other defenses of Debtor in making such determination. There is no guarantee that the Matrix Fund will be sufficient to pay Matrix Tort Claims in full. No Matrix Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed.

                                        3.1.3.1.6 <u>Settled Matrix Tort Claimants</u>. Settled Matrix Tort Claimants shall be paid their pro rata share of the Matrix Fund, which is a portion of the Estate Fund and the Release fund. The amount of their Claim, which is subject to reduction because of such pro ration, shall be the amount more than $45,000 listed in Schedule 11.1.2(b) of the Plan. Settled Matrix Tort Claimants do not need to give any proof of their Claim, and their Claims are not subject to any applicable statute of limitations, any defense based on the passage of time since the date(s) of the Claimant's Abuse, or any other defenses of Debtor. There is no guarantee that the Matrix Fund will be sufficient to pay Settled Matrix Tort Claims in full. No Settled Matrix Tort Claims will be paid until all Matrix Tort Claims have been finally Allowed or Disallowed.

                                        3.1.3.1.7 <u>Litigation Tort Claimants</u>. Litigation Tort Claimants shall be paid their pro rata share of the Litigation Fund, which is a portion of the Estate Fund and the Release Fund. The amount of a Litigation Tort Claimant's Claim shall be determined in a court trial with a right to a jury. Litigation Tort Claimants must prove all elements of their Claim, and their Claims are subject

all defenses the Debtor may have.  There is no guarantee that the Litigation Fund will be sufficient to pay Litigation Tort Claims in full.  No Litigation Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed.

                3.1.3.1.8  <u>Non-Releasing Litigation Tort Claimants</u>. Non-Releasing Litigation Tort Claimants shall be paid their pro rata share of the Non-Releasing Litigation Fund, which is a portion of the Estate Fund only. Non-Releasing Litigation Tort Claimants do not share in the Release Fund.  The amount of a Non-Releasing Litigation Tort Claimant's Claim shall be determined in a court trial with a right to a jury.  Non-Releasing Litigation Tort Claimants must prove all elements of their Claim, and their Claims are subject all defenses the Debtor may have.  Because Non-Releasing Litigation Tort Claims will not share in the Release Fund, it is highly unlikely that the Non-Releasing Litigation Fund will be sufficient to pay Non-Releasing Litigation Tort Claims in full.  No Non-Releasing Litigation Tort Claims will be paid until all such Claims have been finally Allowed or Disallowed.

                3.1.3.1.9  <u>Release of Claims</u>.  Tort Claimants must execute and deliver a Release of Claims to be treated as a holder of a Convenience Tort Claim, a Compromise Tort Claim, a Settled Compromise Tort Claim, a Matrix Tort Claim, a Settled Matrix Tort Claim, or a Litigation Tort Claim, and those who receive such treatment share in both the $18.21 million Estate Fund and the $22.54 million Release Fund.  Tort Claimants who elect treatment as a holder of a Non-Releasing Litigation Tort Claim share in the $18.21 million Estate Fund but do not share in the $22.54 million Release Fund.

                3.1.3.2  <u>No Estimate of Distributions for Matrix Tort Claims, Settled Matrix Tort Claims, Litigation Tort Claims and Non-Releasing Litigation Tort Claims</u>.  It is impossible to predict which or how many Tort Claimants will elect

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 23
291/526062.46
030707 1144/62174.00001