a particular treatment option. It also is impossible to predict the amount that will be Allowed for the Claims of Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants. Therefore, it is impossible to estimate the share of the Matrix Fund, the Litigation Fund or the Non-Releasing Litigation Fund that will be allocated to individual Matrix Tort Claimants, Settled Matrix Tort Claimants, Litigation Tort Claimants and Non-Releasing Litigation Tort Claimants.

        3.1.3.3   <u>Future Tort Claims</u>. The Debtor and the Parishes believe that there will be very few if any Future Tort Claims. The FCR believes that there may be a significant number of Future Tort Claims. The Proponents believe that the funds available for payment of Future Tort Claimants will be sufficient to pay them at least as large a proportion of their Claims as will be paid to other Tort Claimants.

        3.1.4   <u>Establishment of the Plan Trust; Tort Claims Reviewer</u>. On the Effective Date, the Debtor and the Plan Trustee shall execute and commence implementing the Plan Trust Agreement. The Plan Trust will be managed and administered by Plan Trustee. The Plan Trustee shall have complete control of settlements of Litigation Tort Claims, Non-Releasing Litigation Tort Claims and Future Tort Claims-Initial the holders of which elect to proceed with allowance under the FTC Litigation Process. The Reorganized Debtor shall have complete control of settlements of Future Tort Claims-Extended. The TCR shall have no authority to settle other Tort Claims. No one except the holder of the Tort Claim being determined and the TCR, the Plan Trustee or the Reorganized Debtor, as appropriate, (and their counsel) shall have standing to participate in such proceedings; provided that (a) any person may provide information about a Tort Claim and state a position with respect to a Tort Claim to the TCR, the Plan Trustee or the Reorganized Debtor, which information and statement of position

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 24
291/526062.46
030707 1144/62174.00001

shall be transmitted to the affected Tort Claimant, and (b) the TCR, the Plan Trustee or the Reorganized Debtor, in furtherance of the TCR's, Plan Trustee's, or the Reorganized Debtor's duties and obligations and with due regard to the legitimate interest of a Tort Claimant to have information about his or her identity kept confidential, shall have the absolute right to provide any party in interest with any and all information regarding a Tort Claim that is in the possession, custody or control of the TCR, the Plan Trustee or the Reorganized Debtor, including the Questionnaire and the information constituting Proof of Abuse described below, subject to an agreement with the party in interest to keep such information confidential. The TCR, the Plan Trustee or the Reorganized Debtor, as appropriate, shall give the Claimant notice and an opportunity to object before providing such information, and the decision of the TCR, the Plan Trustee or the Reorganized Debtor, as appropriate, on such objection shall be final and not subject to any appeal, review or protective order. Debtor, the Reorganized Debtor and their counsel shall provide a copy of its complete file with respect to every Tort Claim to the Plan Trustee (with respect to claims to be determined by the Plan Trustee) and to the TCR (with respect to claims to be determined by the TCR), and shall cooperate fully with the TCR and the Plan Trustee as requested by the TCR or the Plan Trustee. The TCC, the TLC and the FCR and their counsel shall cooperate fully with the TCR and the Plan Trustee as requested by the TCR or the Plan Trustee. The expenses for attorneys' fees and costs incurred by Debtor's, Reorganized Debtor's, TCC's, TLC's and FCR's counsel at the request of the TCR or the Plan Trustee shall be paid by the Plan Trust.

        3.1.5 <u>All Information about Tort Claimants Confidential</u>. Subject to Article 3.1.4, all information the Plan Trustee, the TCR, the Debtor or the Reorganized Debtor receive from any source about any Tort Claim, and all

information the Plan Trustee, the TCR, the Debtor or the Reorganized Debtor provide to another party, shall be held strictly confidential and shall not be disclosed to any third party, except to the extent ordered by a court of competent jurisdiction in connection with a Litigation Tort Claim.

      3.2    <u>Payment of Other Allowed Claims</u>.  All Allowed Claims except Tort Claims shall be paid by the Reorganized Debtor.  The following is a summary of the projected distributions for other Allowed Claims under the Plan, based on the amount of Claims scheduled by the Debtor and/or filed by Creditors, Scheduled unless otherwise noted below:

| Class/Nature of Claim | Treatment | Approximate Total Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| Class 1 Priority Employee Unsecured Claims | Unimpaired | $7,756 | Various depending upon Employee's status and use of vacation time and sick leave time | Have been and will continue to be satisfied by Debtor, and by Reorganized Debtor assuming and honoring policy after Effective Date |
| Class 2 Priority Unsecured Claims | Unimpaired | $0[26] | Claim Payment Date | $0 |
| Class 3 Secured Claims | Unimpaired | $44,625 | Claim Payment Date[27] | $44,625 |
| Class 4 General Unsecured Convenience Claims | Unimpaired | $17,869[28] | Claim Payment Date | $17,869 |
| Class 5 Deposit and Loan Claims | Impaired | $4,396,664[29] | Only after $47 million of Debtor's Note is paid | Allowed Deposit and Loan Claims of the Parishes and Catholic Entities shall be paid from |

[26] No Priority Unsecured Claims were scheduled or filed except priority tax claims which are treated as Unclassified Priority Tax Claims.

[27] Unless the real property is sold prior to the Effective Date, in which case the taxes will be paid in full in cash at closing.

[28] This assumes that no holders of General Unsecured Claims in excess of $500 will reduce their claims to $500 in order to receive a payment before the dates on which installments will be paid on such Claims.

[29] See Schedule 9.2 of the Plan.  All other Parish and Catholic Entity Secured and Unsecured Claims totaling approximately $182 million, including claims for liens on or otherwise related to the Parish Properties, shall be disallowed in full on the Effective Date.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 26

291/526062.46
030707 1144/62174.00001

| Class/Nature of Claim | Treatment | Approximate Total Claims | Estimated Dates of Distributions | Estimated Distributions |
|---|---|---|---|---|
| | | | | the proceeds of DLF Loans[30] and the balance shall be paid in accordance with an agreement between Reorganized Debtor and the Parishes and Catholic Entities to be negotiated outside the Plan, but shall not be paid until $47 million of Debtor's Note is paid |
| Class 6 General Unsecured Claims | Impaired | $238,570 | 2 equal installments, plus interest, approximately 11 months and 17 months days after the latter of the Effective Date or the date on which Claim becomes an Allowed Claim | $238,570 |
| Class 8 Priest Retirement Claims | Unimpaired | $4.5 million[31] | Dependent upon timing of retirement | In accordance with the Priest Retirement Plan, as it may be amended from time to time or as it may be replaced by another retirement plan with the approval of the Presbyterate and Presbyteral Council |
| Administrative Expense Claims | Unimpaired | $7,000,000[32] | Claim Payment Date | $7,000,000 |
| Unclassified Priority Tax Claims | Unimpaired | $3,777 | Claim Payment Date | $3,777 |

# IV.  THE DEBTOR

---

[30] The Debtor reports that the balance of the DLF Loans as of December 31, 2006 was $2,625,288.20.

[31] This is the approximate present value Priest Retirement Claims according to Debtor.

[32] This is the Proponents' estimate total of unpaid Professional Fees through the Effective Date, including approximately $1.8 million paid on or about January 31, 2007 which will be deducted from Debtor's $48 million note..  Ordinary Course Administrative Expense Claim have been and will continue to be paid in the ordinary course of business in accordance with the terms and conditions of the particular agreement governing such Claim, and are not included here.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 27

291/526062.46
030707 1144/62174.00001

4.1     <u>Legal Structure of the Debtor</u>.  The Debtor is a Washington corporation sole, formed pursuant to RCW 24.12.010 et seq.  The Bishop of the Debtor is the Most Reverend William S. Skylstad.  The Debtor currently has 20 full-time and 8 part-time employees.

4.2     <u>Description of the Debtor's Business</u>.  The Diocese ministers to approximately 95,000 Catholics representing over 26,000 households in thirteen counties in Eastern Washington, including Okanogan, Ferry, Stevens, Pend Oreille, Lincoln, Spokane, Adams, Whitman, Franklin, Walla Walla, Columbia, Garfield and Asotin.  The Diocese serves the ecclesiastical, administrative and pastoral needs of over eighty parishes, two missions, a retreat house, a college seminary house of formation, a high school in Walla Walla and sixteen Catholic elementary schools.

As of Fall 2006, the Parish Schools within the Diocese had a total student enrollment (PK-12) of  2,987.  The schools within the Diocese currently employ 460 individuals.  In addition to the schools, the Parishes employed approximately 350 people.

4.3     <u>History of Debtor Prior to Filing</u>.  The Spokane Diocese's roots date back to 1838 when the first Mass was celebrated near Kettle Falls on the Columbia River.  In the early 1840s, Catholic missions were founded in Cusick, Kettle Falls and Wallula.  Walla Walla's mission was founded in 1847 and the mission in Oroville was established in 1862.  The presence of the Catholic community in this area goes back at least 169 years, 23 years prior to the Civil War and 51 years before statehood.

Beginning in early 2002, the Spokane Diocese experienced a dramatic increase in the number of claims of sexual abuse of minors by Diocesan clergy. The first sexual abuse lawsuit against the Diocese was filed in Spokane County

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 28
291/526062.46
030707 1144/62174.00001

1  Superior Court on September 26, 2002. Over the following two years twenty (20)

2  additional sexual abuse lawsuits were filed against the Diocese. As of the Petition

3  Date, the Diocese was a named defendant in nineteen sexual abuse lawsuits

4  involving fifty-seven (57) individuals. The Diocese of Spokane filed for Chapter 11

5  Reorganization as a direct result of the legal claims arising out of the sexual abuse

6  of minors by Diocesan clergy.

7      4.4    <u>Pending and Contemplated Litigation</u>. Except for the Avoidance

8  Action discussed below in Article 4.7.2.10, all pending litigation will be resolved

9  under the Plan, and no further litigation except with respect to Litigation Tort

10  Claims, Non-Releasing Litigation Tort Claims and Future Tort Claims is

11  contemplated.

12      4.5    <u>Payments for Services</u>. The Proponents anticipate that applications

13  for approval of unpaid Professional Fee of approximately $7 million[33] will be filed

14  before or shortly after the Effective Date.

15      4.6    <u>Management and Compensation</u>. Bishop Skylstad will continue to

16  manage the Debtor. He will continue to be paid $930 per month, plus housing and

17  fringe benefits. Bishop Skylstad will be assisted by Rev. Steven Dublinski, Vicar

18  General and Moderator of the Curia, whose salary is $1,350 per month, plus

19  housing and benefits; and Rev. John Steiner, Vicar General, whose salary is also

20  $1,350 per month, plus housing and benefits. Rev. Dublinski's and Rev. Steiner's

21  salaries, housing and benefits are provided by the parishes of Cathedral of Our

22  Lady of Lourdes and St. Mary's, respectively. Bishop Skylstad is also assisted by

23  Deacon Michael D. Miller, Secretary of Business Affairs, whose salary is $5,410

24  per month, plus benefits.

25

26  ───────────────
[33] See footnote 4.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 29
291/526062.46
030707 1144/62174.00001

4.7 <u>Transactions with Insiders</u>. Other than payment of salaries and fringe benefits, there have been no transactions between the Debtor and any Insiders.

4.8 <u>The Financial Structure and Operations of the Debtor</u>. The operations of the Debtor will be funded through three primary sources: (1) the Annual Catholic Appeal which typically takes place in February of each year; (2) grants and direct donations; and (3) investment income.[34] The operations of the Parishes and Catholic Entities are funded through two primary sources: (1) grants and direct donations, and (2) tuition and other fees for services.

Information regarding the Debtor's historical financial performance is contained in the unaudited financial statements for fiscal year ending June 30, 2006, and the unaudited internally prepared financial statement for period ending December 31, 2006, which are attached hereto as Exhibits 3 and 4.

Projections and underlying assumptions concerning the Debtor's operations are set forth in the Budget attached as Exhibit 1 , which show that the Debtor will be able to perform its obligations under the Plan.

4.9 <u>The Debtor's Assets and Liabilities</u>. Following is a description of the assets and liabilities of the Debtor.

4.9.1 <u>Assets</u>.

4.9.1.1 <u>Disputed and Undisputed Property</u>. The Debtor holds both the legal and the beneficial interest in certain real and personal property ("Undisputed Real and Personal Property"). The Debtor, the Parishes and the Participating Catholic Entities asserts that Debtor holds only legal title to certain real and personal property, that the Parishes and Participating Catholic

---

[34] Historically, the Debtor also was funded by the difference between earnings on the DLF and the fixed rate of return paid to Parishes and Catholic Entities in regard to their deposits in the DLF. Under the Plan, returns on the DLF will be used to pay Deposit and Loan Claims.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 30
291/526062.46
030707 1144/62174.00001

Entities hold the beneficial interest in a portion of such real and personal property ("Parish Property" and "Catholic Entity Property"), that the Debtor holds only a restricted beneficial interest in a portion of such real and personal property ("Alleged Restricted Property"), and that all Parish Property, Catholic Entity Property and Alleged Restricted Property is not available to pay Claims ("Disputed Real and Personal Property"). The TCC, the FCR and the TLC dispute this assertion, which is at issue in the Section 541 Litigation. On August 26, 2005, the Bankruptcy Court ruled that the Debtor holds both legal title and the beneficial interests in 22 of the Disputed Real Properties. The Debtor and the Parishes appealed this ruling. On June 15, 2006, the District Court reversed the Bankruptcy Court's ruling and remanded the case for further proceedings. The Proponents believe that the sale price of Debtor's interest in the Disputed Real and Personal Property to the Parishes and Catholic Entities which use such property as proposed in the Plan fairly values the Debtor's interest in such Property.

4.9.1.2 <u>Real Property</u>.

4.9.1.2.1 <u>Appraisal of All Real Property</u>. On December 22, 2005, the Court approved the joint application and appraisal plan filed by the TLC, TCC and FCR for the retention of GVA Kidder Mathews to appraise 40 of the highest valued real properties, and to provided consulting valuations with respect to the remaining real properties. The appraiser delivered its appraisals and consulting report in April 2006, estimating the fair market value of all of the real property at more than $80 million. The report valued all real property used for churches and schools on the assumption that such real property could be sold within a reasonable period of time to a buyer which also would use it for the same purpose. The Proponents believe that it unlikely that all of the real property could be sold in this manner, and that a sale within a reasonable period of

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 31
291/526062.46
030707 1144/62174.00001

time would yield substantially less than $80 million.  The Debtor and the AOP believe that a sale within a reasonable period of time likely would yield less than $20 million.  The TCC and the FCR believe that such a sale would yield $30 million or more.  None of these values are adjusted for the disputed ownership of most of this property.

4.9.1.2.2  <u>Undisputed Real Property</u>.  The Debtor's Undisputed Real Property is as follows:

| | |
|---|---|
| Catholic Pastoral Center (Chancery) | |
| Fairfield Agricultural Land (Mattausch Farm) | |
| Bishop White Seminary | |
| Bishop White Seminary SFR | |
| Bishop's House | |
| Chester Property | |
| Freeway Property | |

The appraised and estimated value of Debtor's Undisputed Real Property is approximately $5.5 million.  The Debtor plans to sell all Undisputed Real Property as may be necessary to pay the Debtor's Note and to fund Debtor's operations pursuant to the Budget.

4.9.1.2.3  <u>Disputed Real Property</u>.  The appraised value of Debtor's Disputed Real Property is approximately $78 million.  The Debtor's interest in the Disputed Real Property and Disputed Personal Property used in connection with the Disputed Real Property shall be sold to the Parishes for $14 million and the Participating Catholic Entities for a total of $5.7 million, and the proceeds shall be used pay the Debtor's Note and to fund Reorganized Debtor's operations pursuant to the Budget.[35]

---

[35], The Proponents believe that the fair market value of the Disputed Personal Property used by the Parishes is nominal in comparison to the Disputed Real Property.  Such Personal Property is not discussed separately in Article 4.7.1.3 below.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 32
291/526062.46
030707 1144/62174.00001

4.9.1.3   <u>Personal Property</u>.

4.9.1.3.1   <u>Cash</u>.  As of December 31, 2006, Debtor reported holding Cash in the amount of $2,410,249.  Debtor states that $1,823,935 of the Cash is subject to restrictions which prevent its use for payment of Claims.

4.9.1.3.2   <u>Accounts Receivable</u>.  These assets consist of amounts owed to the Debtor by Parishes, primarily for construction loans that the Parishes received from the DLF (the "DLF Loans").  According to the Debtor, the principal balance of the DLF Loans was $3,217,514 on the Petition Date, and after payments of principal and interest to the Debtor thereafter, the remaining balance of the DLF Loans as of December 31, 2006 was $2,625,288.20.  As of December 31, 2006, Debtor reported other Loans, Accounts and Pledges Receivable totaling $206,129.00.

4.9.1.3.3   <u>Office Equipment, and Other Tangible Personal Property</u>.  As of the Petition Date, the book value of the Debtor's office equipment, furnishing and supplies was $484,834.

4.9.1.3.4   <u>Insurance Settlements</u>.  The Debtor has settled its claims against its Insurers for approximately $19.8 million.  The Insurance Settlements will be submitted for approval by the Bankruptcy Court on or before the Confirmation Date.

4.9.1.3.5   <u>Interest of Bishop in Participating Catholic Entities</u>.  The Debtor is a member or sole member of a number of separately incorporated nonprofit Washington corporations related to the Debtor, including Catholic Cemeteries of Spokane, Morning Star Boys' Ranch, Catholic Charities of Spokane and Immaculate Heart Retreat Center ("Participating Catholic Entities").  Any interest of the Debtor in the personal property used by the Participating Catholic Entities, and in the Guse Trust, is included in the Disputed Real Property

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 33
291/526062.46
030707 1144/62174.00001

which is being sold by Debtor to the Participating Catholic Entities for $5.7 million in cash and real property.

4.9.1.3.6   Certain Other Corporations.   The Debtor is a member or sole member of a number of additions separately incorporated nonprofit Washington corporations related to the Debtor.  These corporations include Catholic Foundation of Spokane, The Spokane Catholic Investment Trust, and Immaculate Heart Retreat Foundation.  The Proponents do not believe that Debtor's interest in these entities has any material market value.

4.9.2   Liabilities.

4.9.2.1   Tort Claims.   208 individual Tort Claims were filed in the Reorganization Case.  24 duplicate, late filed and facially invalid Tort Claims have been disallowed.  The Proponents estimate that after pending claims objections are resolved, at least 175 individual Tort Claims and an unknown number of Future Tort Claims remain to be dealt with under the Plan.  The Plan provides for payments of approximately $40 million to holders of Convenience, Compromise, Settled Compromise, Matrix, Settled Matrix, Litigation, and Non-Releasing Litigation Tort Claims.  The Proponents believe that the Allowed amount of all such Tort Claims will exceed $40 million.  The Plan also provides for payments of $1 million, plus an undetermined amount from the Future Claims Commitment, for Future Tort Claims-Initial, and an undetermined amount for Future Tort Claims-Extended from the Reorganized Debtor's insurance.

4.9.2.2   Priority Employee Unsecured Claims.   Scheduled and filed Priority Employee Unsecured Claims total $17,301, of which $7,756 remain unpaid.  Such Claims have been and shall continue to be satisfied by Reorganized Debtor assuming and honoring its policies regarding such Claims after Effective Date.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 34
291/526062.46
030707 1144/62174.00001

4.9.2.3   Priority Unsecured Claims.  No Priority Unsecured Claims were scheduled or filed, except priority tax claims treated as Unclassified Priority Tax Claims.

4.9.2.4   Secured Claims.  Secured Claims in the amount of $44,625 have been scheduled and filed.

4.9.2.5   General Unsecured Claims.  General Unsecured Claims in the amount of $1,120,131 have been scheduled and filed, of which the Proponents estimate approximately $256,439 will be allowed.  Claims totaling $17,869 are entitled to priority payment as General Unsecured Convenience Claims, and the balance of $238,570 shall be paid as General Unsecured Claims.

4.9.2.6   Parish and Catholic Entity Secured and Unsecured Claims.  The Parishes and Catholic Entities have filed claims related to the Disputed Real and Personal Property totaling approximately $182 million which shall be Disallowed pursuant to the Plan.  Deposit and Loan Claims of $4,396,664 listed in Schedule 9.2 of the Plan will be Allowed.  Deposit and Loan Claims will be paid in part from the proceeds of the DLF Loans, with the balance paid in accordance with an agreement between Reorganized Debtor and the Parishes and Catholic Entities to be negotiated outside the Plan, but shall not be paid until $47 million of the Debtor's Note has been paid.

4.9.2.7   Priest Retirement.  The Debtor is the sponsor of the Priest Retirement Plan, which Debtor states is a defined benefit plan.  As of June 30, 2005, the Debtor stated that its unfunded liability to the Priest Retirement Plan was approximately $4.5 million based on an actuarial analysis conducted for and on behalf of the Debtor.  Debtor will provide the actuarial analysis upon request.

1    4.9.2.8    <u>Administrative Expense Claims</u>.  As of December

2    31, 2006, $2,575,684 of Professional Fees have been paid, and $5,655,740 have

3    been billed and remain unpaid.  Proponents' estimate that additional Professional

4    Fees through the Effective Date will total approximately $1.345 million.  Ordinary

5    Course Administrative Expense Claims have been and shall continue to be paid in

6    the ordinary course of business in accordance with the terms and conditions of the

7    particular agreement governing such Claim.  As of December 31, 2006 unpaid

8    Ordinary Course Administrative Expenses totaled $0 because the Debtor pays

9    Ordinary Course Administrative Expenses every week.  Ordinary Course

10   Administrative Expenses total approximately $262,775 per month.

11            4.9.2.9    <u>Unclassified Priority Tax Claims</u>.  Unclassified

12   Priority Tax Claims in the amount of $3,777 have been scheduled and filed.

13            4.9.2.10  <u>Avoidance Actions</u>.

14            4.9.2.10.1 <u>Paine Hamblen</u>.  The Plan Trustee shall

15   have all of the rights and remedies of the Debtor and the Reorganized Debtor as

16   of the Effective Date with respect to, and may commence and prosecute, provided

17   there is a basis therefore, an Avoidance Action against Paine Hamblen LLP with

18   respect to Professional Fees paid before the Bankruptcy Case was filed.   Paine

19   Hamblen shall retain any and all defenses it has or may have in the event such an

20   action is filed.

21            4.9.2.10.2 <u>Parishes and Catholic Entities</u>.  Pending

22   Avoidance Actions against the Parishes and Catholic Entities will be dismissed

23   with prejudice in consideration of payments they will make under the Plan.

24            4.9.2.10.3 <u>Unrelated Entities</u>.  The Proponents

25   believe that it would not be cost-effective to pursue possible Avoidance Actions

26

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 36
291/526062.46
030707 1144/62174.00001

against unrelated entities, and the Plan provides that such actions shall not be pursued.

### 4.9.3 Summary of Assets and Liabilities.

#### 4.9.3.1 Assets.

| DESCRIPTION | |
|---|---|
| Undisputed Real Property | $5,500,000 |
| Disputed Real Property | 19,700,000[36] |
| Unrestricted Cash | 586,314 |
| Restricted Cash | 1,823,935 |
| Loans, Accounts and Pledges Receivable | 206,129 |
| DLF Loans | 2,625,288 |
| Office Equipment, and Other Tangible Personal Property | 484,834 |
| Insurance Actions | 19,814,290 |
| Interest of Bishop in Certain Other Corporations[37] | 0 |
| TOTAL | $50,740,790.00 |

#### 4.9.3.2 Liabilities.

| DESCRIPTION | |
|---|---|
| Tort Claims | more than $40,000,000 |
| Priority Employee Unsecured Claims. | 7,756 |
| Priority Unsecured Claims | 0 |
| Secured Claims | 44,625 |
| General Unsecured Convenience Claims [38] | 17,869 |
| General Unsecured Claims | 238,570 |
| Deposit and Loan Claims[39] | 4,396,664 |
| Priest Retirement | 4,500,000 |
| Administrative Expense Claims | 7,000,000 |
| Unclassified Priority Tax Claims | 3,777 |
| | |
| TOTAL | more than $56,209,261 |

---

[36] This is the price at which Debtor's interest will be sold to the Parishes and Catholic Entities pursuant to the Plan.
[37] Included in Disputed Real Property.
[38] This assumes that no holders of General Unsecured Claims in excess of $500 will reduce their claims to $500 in order to receive a payment before the dates on which installments will be paid on such Claims.
[39] These Claims will not be paid until all $47 million has been paid on Debtor's Note.

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 37
291/526062.46
030707 1144/62174.00001

## V.  SIGNIFICANT EVENTS IN CHAPTER 11

The following significant events have occurred in the Reorganization Case:

5.1     The Debtor commenced this Reorganization Case by filing a voluntary Chapter 11 petition on December 6, 2004.  The Debtor has stated that it filed the Reorganization Case in order to reorganize its financial affairs which were severely threatened by a number of lawsuits filed by Tort Claimants.

5.2     The Debtor asserted that it did not own the beneficial interest in the Parish Property and the Alleged Restricted Property.

5.3     The Court entered a Cash Management Order permitting the Debtor, the Parishes and the Catholic Entities to continue to use their bank accounts and cash management system, and to continue to operate in the ordinary course of business.

5.4     On February 4, 2005, the TLC filed the Section 541 Litigation asserting that the Debtor owns the legal and beneficial interest in the Parish Property, which assertion was supported by the TCC and the FCR.

5.5     The Hon. Gregg Zive, Chief Judge of the United States Bankruptcy Court for the District of Nevada was appointed as a potential mediator of disputes relating to the 541 Litigation and the Plan.

5.6     The Court on August 26, 2005, granted summary judgment in favor of the TLC in the Section 541 Litigation ruling that the Debtor owns the beneficial interest in 22 parcels of the Parish Real Property.

5.7     The Court set a deadline (the Claims Bar Date) of March 10, 2006, for Creditors to file Proofs of Claim.

5.8     The Debtor offered to settle the Tort Claims of 57 Claimants who had filed lawsuits before December 6, 2004, and of 18 Claimants who had not but who were represented by some of the same tort lawyers who represented the 57

Claimants, for $45.7 million, without making provision for the remaining Tort Claims acceptable to the TCC, the FCR, the AOP and other parties in interest. The Court upheld the objections of the TCC, the FCR, the AOP and others to the offered settlement.

5.9    On June 30, 2006, the District Court reversed the summary judgment in the Section 541 Litigation and remanded the case to the Bankruptcy Court for further proceedings.

5.10    The Debtor, the AOP, the TCC, the FCR, the TLC and other parties in interest sought to settle all disputes through mediation before Judge Zive.  The Proponents agreed to the provisions of the Plan during the mediation.

5.11    The Proponents filed their Plan of Reorganization and this Disclosure Statement.

## VI.  DISTRIBUTIONS UNDER THE PLAN

6.1    <u>Distributions on Business Days</u>.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

6.2    <u>Disputed Claims Reserve</u>.  The Debtor or the Reorganized Debtor shall reserve for each Disputed Claim from amounts otherwise distributable under this Plan in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an order of the Court, or (ii) if no such order has been entered with respect to such Claim, the greater of (A) the amount listed in the Debtor's Schedule of Assets and Liabilities and (B) the amount set forth in a proof of claim or application for payment filed with the Court.  Such reserved amounts, collectively shall constitute the "Disputed Claims Reserve".  The Reorganized Debtor shall hold the Disputed Claims Reserve for the holders of Disputed Claims to be distributed in accordance with the resolution of such Disputed Claims.

Claims filed or scheduled without an amount shall be reserved at $1 unless otherwise ordered by the Court.  This Article 6.2 shall not be applicable to Tort Claims.

6.3    Interest on Claims.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition and post-Confirmation interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

## VII.  EXECUTORY CONTRACTS

7.1    Motion to Assume and Reject.  The Plan constitutes a motion to assume and reject executory contracts and unexpired leases.  Upon confirmation of the Plan and without any further act, the Debtor shall be deemed to have rejected all executory contracts and unexpired leases not previously assumed or rejected or not listed in Schedule 17.1 of the Plan, if any, and shall be deemed to have assumed all executory contracts and unexpired leases listed in Schedule 17.1.

7.2    Rejection Claims.  Any Claim arising from the rejection of an executory contract or unexpired lease is a Class General Unsecured 6 Claim to the extent it is an Allowed Claim.  Any entity holding a Claim based upon the rejection of an executory contract or unexpired lease pursuant to Article 17 of the Plan must file a Proof of Claim with the Bankruptcy Court within 30 days after the Effective Date.  The failure of any such entity to file a Proof of Claim within the specified time period will result in the disallowance of such Claim.

## VIII.  CONDITIONS TO EFFECTIVE DATE

8.1    Proponents' Conditions to Occurrence of Effective Date.  Each of the following are conditions to the occurrence of the Effective Date, which conditions must be satisfied or waived by each of the Proponents:

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 40
291/526062.46
030707 1144/62174.00001

8.1.1   The Confirmation Order has been entered by the Bankruptcy Court and has not been stayed.

8.1.2   The Confirmation Order is in form and substance satisfactory to the Proponents and the TLC.

8.1.3   All actions, documents, and agreements necessary to implement the Plan will have been effected or executed.

8.1.4   All Insurance Settlements have been approved by the Bankruptcy Court.

8.2   <u>Insurer's Conditions to Occurrence of Effective Date</u>.  All Insurance Settlements must be approved by the Bankruptcy Court before the Effective Date unless this condition is waived by each of the Insurers.

8.3   <u>Deadline for Satisfaction of Conditions; Effect of Failure to Satisfy Conditions</u>.  All conditions to the Effective Date must be satisfied or waived no later than May 31, 2007.  If the Effective Date has not occurred by May 31, 2007, the Confirmation Order shall be vacated automatically unless all of the Proponents and the TLC agree in writing to extend the deadline.

## IX.  EFFECTS OF CONFIRMATION

9.1   <u>Discharge</u>.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date the Debtor and the Reorganized Debtor shall be discharged from and its liability shall be extinguished completely in respect of any Claim, including Tort Claims but excluding Post Petition Abuse Claims, to the extent permitted by the Bankruptcy Code.  Such discharged claims are referred to as "Discharged Claims".  Post Petition Abuse Claims shall not be discharged.  Notwithstanding the foregoing, nothing in Article 20.1 of the Plan shall discharge any obligations of the Debtor under the Insurance Settlements.

9.2   ***Exculpation and Limitation of Liability***.  *Neither the Debtor, the Reorganized Debtor, the AOP, the Committees, the Future Claims Representative, the Plan Trustee, the TCR, nor any of their respective present or former members, managers, officers, directors, employees, advisors, attorneys, or agents acting in such capacity will have or incur any liability to, or be subject to any right of action by, any holder of a Claim (including a Future Tort Claim) or any other party-in-interest or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Reorganization Case, the pursuit of confirmation of the Plan, or the administration of the Plan or Plan Trust, or the property to be distributed under the Plan or Plan Trust, except for their willful misconduct and Avoidance Actions provided for in Article 15.14 of the Plan; and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or the Plan Trust or in the context of the Reorganization Case.*

9.3   ***Permanent Injunction Against Prosecution of Released Claims***.  *"Released Parties" means the Parishes, the Parish Entities, the Catholic Entities (except Morning Star Boys' Ranch) and the Insurers, and their respective agents, predecessors, successors, officials, subsidiaries, divisions, affiliates, representatives, attorneys, accountants, and all others acting for or on their behalf (except individuals alleged to have engaged in Abuse).  Except as otherwise expressly provided in the Plan, for the consideration described in Articles 15.3, .4, .8, and .9 of the Plan, all Persons who have executed and delivered Releases of Claims shall be permanently*

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 42
291/526062.46
030707 1144/62174.00001

*enjoined on and after the Effective Date from: (a) commencing or continuing*

*in any manner, any action or any other proceeding of any kind with respect*

*to any Claim against the Released Parties or the property of the Released*

*Parties related to a Discharged Claim; (b) seeking the enforcement,*

*attachment, collection or recovery by any manner or means of any*

*judgment, award, decree, or order against the Released Parties or the*

*property of the Released Parties, with respect any Claim against the*

*Released Parties related to a Discharged Claim; (c) creating, perfecting, or*

*enforcing any encumbrance of any kind against the Released Parties or the*

*property of the Released Parties with respect any Claim against the*

*Released Parties related to a Discharged Claim; (d) asserting any setoff,*

*right of subrogation, or recoupment of any kind against any obligation due*

*to the Released Parties with respect any Claim against the Released Parties*

*related to a Discharged Claim; and (e) taking any act, in any manner and in*

*any place whatsoever with respect any Claim against the Released Parties*

*related to a Discharged Claim, that does not conform to or comply with*

*provisions of the Plan or the Plan Trust.  Such injunction is referred to as the*

*"Permanent Injunction".*

9.4    *Settling Insurer Injunction.  All Persons (except Morningstar*

*Boys' Ranch) who have held, hold, or may hold Claims, including but not*

*limited to Tort Claims, against an Insurer that are barred pursuant an order*

*approving an Insurance Settlement, whether known or unknown, and their*

*respective agents, attorneys, and all others acting for or on their behalf,*

*shall be permanently enjoined on and after the Effective Date from:  (a)*

*commencing or continuing in any manner, any action or any other*

*proceeding of any kind with respect to any such Claim, including, but not*

*limited to, any Tort Claim, Future Tort Claim, or FCR Tort Claim, for*
*indemnity, contribution, subrogation or based on any similar theory; against*
*such Insurer, and its respective predecessors, successors, officials,*
*shareholders subsidiaries, divisions, affiliates, representatives, attorneys,*
*merged or acquired companies or operations or assigns (collectively, the*
*"Insurer Parties") or the property of the Parties; (b) seeking the enforcement,*
*attachment, collection or recovery by any manner or means of any*
*judgment, award, decree, or order against the Parties or the property of the*
*Parties, with respect to any such Claim; (c) creating, perfecting, or enforcing*
*any encumbrance of any kind against the Parties or the property of the*
*Parties with respect to any such Claim; (d) asserting any setoff, right of*
*subrogation, or recoupment of any kind against any obligation due to the*
*Parties with respect to any such Claim; and (e) taking any act, in any manner*
*and in any place whatsoever, that does not conform to or comply with*
*provisions of the Plan or the Trust Agreement.  In the event any Person*
*takes any action that is prohibited by, or is otherwise inconsistent with the*
*provisions of this Article 20.4 or the Plan, then, upon notice to the Court by*
*an affected Party, the action or proceeding in which the Claim of such*
*Person is asserted will automatically be transferred to the Bankruptcy Court*
*or the District Court for enforcement of the provisions of Article 20.4 and*
*other provisions of the Plan.*

9.5     <u>No Release of Other Entities or Policies</u>.  None of the provisions of
the Plan, the Confirmation Order, or the Insurance Settlements or orders
approving the Insurance Settlements with the Insurers entered in this case affect
the rights of a Tort Claimant to pursue a claim or recovery against (a) any person
or entity which is not a Released Party, and/or (b) any insurance policies other

than the insurance policies that are the subject of the Insurance Settlements. The persons or entities referred to in this Article 9.5 as persons or entities which are not a Released Party include, but are not limited to, the Archdiocese of Seattle, Morning Star Boys' Ranch, Rosalia School District, The Sulpicians (Order of St. Sulpice), the Society of Jesus (Jesuits), Patrick O'Donnell individually, James O'Malley individually, and/or any other priest or other individual alleged to have engaged in Abuse. Except as specifically provided herein, nothing in this Article 9.5 limits the rights and obligations of Morning Star Boys' Ranch under this Plan.

## X. REORGANIZATION OF DEBTOR

10.1 <u>Continued Corporate Existence</u>. Reorganized Debtor shall continue to exist in accordance with the law of Washington and, subject to the limitations provided in Article 25.7 of the Plan, Canon Law, and pursuant to its Articles of Incorporation and Bylaws in effect prior to the Effective Date. On and after the Effective Date, Reorganized Debtor may operate its business and may use, acquire and dispose of property without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules except as provided in the Plan.

10.2 <u>Management of Reorganized Debtor</u>. From and after the Effective Date, the Reorganized Debtor shall continue to be managed in accordance with applicable law.

10.3 <u>Parish Reorganization</u>. On or before the Effective Date, each of the Parishes may form a legal entity, cognizable as such by civil law and, subject to the limitations provided in Article 25.7 of the Plan, consistent with Canon Law, for the purpose of holding title to and/or beneficial interests in the Parishes' assets.

## XI. NON-MONETARY UNDERTAKINGS OF DEBTOR

The Debtor and/or Bishop William S. Skylstad will undertake the following non-monetary obligations within thirty (30) days after the Effective Date, unless otherwise noted.

11.1   For a period of not less than 9 years after the Effective Date, the Debtor will post on the Diocesan web site the names of ALL known Spokane diocesan clergy, religious clergy not incardinated in the Spokane diocese who nevertheless were functioning as clergy in and for the Spokane diocese, and order clergy or religious who are admitted, proven or credibly accused perpetrators.  For any such perpetrator who is deceased, the name of such perpetrator shall be posted in accordance with the Spokane Diocese Review Board Policy which provides for publication of the name of a deceased priest against whom a credible allegation of sexual abuse has been made only if it is requested by the abused person that the deceased priest's name be publicized.  Notwithstanding the foregoing, the Debtor shall maintain the posting for any longer period of time if recommended by the U.S. Conference of Catholic Bishops.

11.2   Debtor will also continue publication on the web site of the postings of admitted, proven or credibly accused perpetrators described above which have been posted since 2002 for the same period of time as described in Article 26.1 above.

11.3   Within one (1) year after the Effective Date, Bishop Skylstad will himself go to every parish in which any children were abused or where perpetrators served and read from the pulpit a statement identifying all perpetrators that have served in the parish and urge people to come forward and contact law enforcement, the diocesan Victim's Assistance Coordinator and/or any survivor group or organization felt appropriate by the person wishing to make a report of abuse.

11.4    Debtor will publish in the Inland Register four times per year for five (5) years after the Effective Date and one time per year for twenty (20) years thereafter, a prominent statement urging persons sexually abused by priests or religious to come forward and contact law enforcement, and the diocesan Victim's Assistance Coordinator and/or any survivor group or organization felt appropriate by the person wishing to make a report of abuse.

11.5    Bishop Skylstad will publicly support a complete elimination of all criminal statutes of limitation for child sexual abuse.

11.6    For two (2) years after the Effective Date, the Debtor will allow any person holding an Allowed Tort Claim to speak publicly in the parish where they were Abused at a time mutually agreed upon by the person holding the Allowed Tort Claim, the Debtor and the parish pastor and/or administrator.  Any such persons holding an Allowed Tort Claim who wishes to so speak publicly in the parish where they were abused shall be entitled to speak on no more than one occasion per Tort Claimant and reasonable notice of the occasion, time and place of his or her presentation shall be given by the Debtor or the parish to parish members.

11.7    Debtor will make available reasonable space but not more than one full page in each issue of the Inland Register for two (2) years after the Effective Date to allow Tort Claimants to tell their stories of abuse by priests if they desire to publish their stories.

11.8    Debtor, and its representatives, will not refer either verbally or in print to the Claims of Tort Claimants as "alleged" Claims.

11.9    Within a reasonable time after the allowance of any Tort Claim, Bishop Skylstad will send letters of apology to the Tort Claimant and, if requested by the Tort Claimant, his or her immediate family.

## XII.  SATISFACTION AND CANCELLATION OF INDEBTEDNESS

The provision made to the holders of Allowed Claims provided for in the Plan shall be in full and complete satisfaction of their Allowed Claims.  Except for purposes of evidencing a right to distribution under the Plan, on the Effective Date, all notes, guarantees, or other instruments or documents evidencing or creating any indebtedness or obligations of, or interests in, Debtor, except (a) all assumed executory contracts, and/or (b) all other notes or other instruments evidencing indebtedness or obligations of Debtor that are unimpaired, restated, or amended and restated under this Plan, shall be cancelled and terminated and of no further force or effect.

## XIII.  FEDERAL TAX CONSEQUENCES

13.1   <u>IN GENERAL</u>.  UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), THERE MAY BE SIGNIFICANT FEDERAL INCOME TAX ISSUES ARISING UNDER THE PLAN THAT AFFECT CREDITORS IN THE CASE.  THERE ALSO MAY BE SIGNIFICANT STATE, LOCAL, AND FOREIGN TAX ISSUES ARISING UNDER THE PLAN.  THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN.  IT IS NOT PRACTICABLE TO PRESENT A DETAILED EXPLANATION OF EVERY POSSIBLE FEDERAL INCOME TAX RAMIFICATIONS OF THE PLAN.

IN PARTICULAR, THE INTERNAL REVENUE SERVICE MAY CONTEND THAT PAYMENTS TO TORT CLAIMANTS MAY BE TAXABLE INCOME DEPENDING ON THE NATURE AND EXTENT OF THE CLAIMANT'S INJURIES. THE TAX TREATMENT OF PAYMENTS ALSO MAY BE AFFECTED IF A TORT CLAIMANT CREATES A STRUCTURED SETTLEMENT AS DESCRIBED IN SECTION 104(A)(2) OF THE INTERNAL REVENUE CODE.

ACCORDINGLY, ALL HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER.  NEITHER THE PROPONENTS NOR PROPONENTS' COUNSEL MAKE ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTOR, THE REORGANIZED DEBTOR OR ANY CREDITOR.

13.2    <u>Qualified Settlement Fund</u>.  The Plan Trust is a "qualified settlement fund" ("QSF") with in the meaning Treasury Regulations enacted under Internal Revenue Code Section 468B(g). The Trust is characterized as a QSF because:

13.2.1 The Trust is established pursuant to an order of, or is approved by, the United States, any state or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

13.2.2 The Trust is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, breach of contract, or violation of law (but excluding non-tort obligations of the Debtor to make payments to its general trade creditors or debt holders that relates to a case under Title 11 of United States Code, a receivership, foreclosure of similar proceeding in a Federal or State court, or a workout); and

13.2.3 The Trust is a trust under Washington state law.

13.3    Consequences of Characterization as Qualified Settlement Fund.
The primary tax consequences of the Trust being characterized as a QSF are the following:

13.3.1 The Trust must use a calendar taxable year and the accrual method of accounting.

13.3.2 If the Debtor funds the Trust with appreciated property, the Debtor is deemed to sell the property to the Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Debtor.

13.3.3 The Trust takes a fair market value basis in property contributed to it by the Debtor.

13.3.4 The Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates (currently 35%). The Debtor's funding of the Trust with cash and other property is not reported by the Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Trust's funds will be subject to tax.

13.3.5 The Trust may deduct from its gross income a limited number of administrative expenses; the Trust is not entitled to deduct distributions paid to its beneficiaries.

13.3.6 The Trust will have a separate taxpayer identification number and shall be required to file annual tax returns (which are due on March 15). The Trust also will be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

**XIV. IMPACT ON SSI, MEDICARE, MEDICAID AND OTHER GOVERNMENT BENEFITS**

Payments to Tort Claimants under the Plan may have an impact on certain government benefits, such as Supplemental Security Income (SSI), Medicaid and Medicare, and certain state and federal laws may affect such impact. Accordingly, all Tort Claimants are strongly urged to consult their benefits advisors.

## XV.  RISK FACTORS

The distributions contemplated under the Plan are contingent upon many assumptions, some or all of which could fail to meet expectations and preclude the Plan from becoming effective or reduce anticipated distributions. For example, there is no guarantee that the estimates of the amounts of Allowed Claims or funds available from liquidation of Debtor's assets, contributions from Parishes and Participating Catholic Entities and Insurance Settlements will be realized.

The Plan is subject to approval by the various classes of Creditors entitled to vote under the Bankruptcy Code and to confirmation of the Plan by the Bankruptcy Court. No assurance can be given that the Plan will be accepted by the requisite number and amount of Creditors or confirmed by the Court. If the Plan is not confirmed, all Creditors face substantial risk that the Debtor would be liquidated under Chapter 7 of the Bankruptcy Code. Payments to Creditors under such alternative circumstances may be substantially less favorable than their recovery provided for by the Plan.

## XVI.  ACCEPTANCE AND CONFIRMATION

16.1  <u>Voting Procedures</u>.  A ballot to be used for voting your acceptance or rejection of the Plan of Reorganization is being mailed to you together with this Disclosure Statement and Plan. Holders of Claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed. IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS NOT LATER THAN APRIL 13, 2007. FAILURE

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 51
291/526062.46
030707 1144/62174.00001

TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED, EXCEPT THAT FAILURE OF A CLAIMANT WHO IS NOT A FUTURE TORT CLAIMANT, A SETTLED COMPROMISE TORT CLAIMANT, A SETTLED MATRIX TORT CLAIMANT OR A NON-RELEASING LITIGATION TORT CLAIMANT TO ELECT TREATMENT AS A CONVENIENCE TORT CLAIM, A COMPROMISE TORT CLAIM, A MATRIX TORT CLAIM, OR A LITIGATION TORT CLAIM AND TO DELIVER A RELEASE OF CLAIMS SHALL BE DEEMED TO BE A CONDITIONAL ELECTION TO BE TREATED AS A HOLDER OF A MATRIX TORT CLAIM. TO COMPLETE SUCH CONDITIONAL ELECTION, THE CLAIMANT MUST EXECUTE AND DELIVER TO THE DEBTOR A RELEASE OF CLAIMS WITHIN 60 DAYS AFTER THE EFFECTIVE DATE. DEBTOR SHALL GIVE SUCH HOLDER NOTICE WITHIN 15 DAYS AFTER THE EFFECTIVE DATE OF SUCH CONDITIONAL ELECTION AND HIS OR HER RIGHT TO COMPLETE SUCH CONDITIONAL ELECTION. IF SUCH HOLDER DOES NOT EXECUTE AND DELIVER TO THE DEBTOR A RELEASE OF CLAIMS WITHIN 60 DAYS AFTER THE EFFECTIVE DATE, SUCH HOLDER SHALL BE DEEMED TO HAVE ELECTED TO BE TREATED AS A HOLDER OF A NON-RELEASING LITIGATION TORT CLAIM.

If more than one-half in number of Claimants voting and at least two-thirds in amount of the allowed Claims of such Claimants in each class of Claims vote to accept the Plan, such classes shall be deemed to have accepted the Plan. For purposes of determining whether a class of Claims has accepted or rejected the Plan, only the votes of those who have timely returned their ballots shall be considered.

16.2 <u>Hearing on Confirmation</u>. The hearing on confirmation of the Plan has been set to begin at 9:00 a.m. on April 24, 2007 before the Honorable Patricia C. Williams, United States Bankruptcy Judge, in Courtroom 327, United States Bankruptcy Court, 901 West Riverside Avenue, Spokane, Washington, 99201. The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code, are satisfied.

16.3 <u>Best Interests of Creditors</u>. In order to satisfy one of the requirements under § 1129 of the Bankruptcy Code, the Proponents must establish that with respect to each class, each holder of a Claim in that class has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value that is not less than the amount that such holder would receive if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code. The Proponents believe that the Plan satisfies the requirements of the best interests of creditors standard because, as shown in the Liquidation Analysis attached hereto as Exhibit 5, each class of creditors will receive on account of the Plan payments equal to or greater than what those same creditors would receive in a hypothetical Chapter 7 liquidation. Accordingly, the Proponents anticipate that the Court will find that the Plan satisfies the best interests of creditors standard at the time of the hearing on Confirmation.

16.4 <u>Feasibility</u>. The Proponents must also establish that confirmation of the Plan is not likely to be followed by the Debtor's liquidation, or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Proponents analyzed the financial and other information contained in the Debtor's First Amended Disclosure Statement, its Schedules of Assets and Liabilities, its Statement of Financial Affairs, its Monthly Financial Statements, its Budget and the attached Plan Funding Projection

attached hereto as Exhibit 6..  Based on this information, the Proponents believe that Confirmation is not likely to be followed by the liquidation or further financial reorganization of the Reorganized Debtor.

16.5    Treatment of Dissenting Classes of Creditors.  The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of Claims or interests that is impaired under, and has not accepted, the Plan.  Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class.  Proponents have requested that the Court confirm the Plan even if creditors holding Claims in impaired classes do not accept the Plan.

16.6    Consequences of the Failure to Confirm the Plan.  If the Court declines to confirm the Plan, whether due to a failure of creditor support or otherwise, the Court may approve a competing plan.  Alternatively, a liquidation of the Debtor's assets might ultimately result, either through a revised Plan under Chapter 11 or a conversion of the Reorganization Case a bankruptcy under Chapter 7 of the Bankruptcy Code with the increased trustee fees and delays that will follow, or a dismissal of the Reorganization Case followed by piecemeal litigation and collection of Tort Claims outside the protection of the Reorganization Case.

## XVII.  CONCLUSION

**THE PROPONENTS URGE YOU TO VOTE TO ACCEPT THE PLAN.**

Dated this 7th day of March, 2007.

RIDDELL WILLIAMS P.S.                    BUSH STROUT & KORNFELD


By:  /s/  George E. Frasier              By:  /s/  Gayle Bush
       George E. Frasier, WSBA #1857          Gayle Bush
       Joseph E. Shickich, Jr., WSBA #8751    Attorney for Unknown Claims
Attorneys for Tort Claimants' Committee  Representative

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 54
291/526062.46
030707 1144/62174.00001

1

2 ELSAESSER JARZABEK ANDERSON          PAINE HAMBLEN LLP
  MARKS ELLIOTT & MCHUGH
3
  By:  /s/  Ford Elsaesser                   By:  /s/  Shaun M. Cross
4       Ford Elsaesser                            Shaun M. Cross
                                                  Daniel J. Gibbons
5 CRUMB & MUNDING, P.S.                           Gregory J. Arpin

6                                           Attorneys for Debtor

  By:  /s/  John D. Munding
7       John D. Munding, WSBA #21734

8 Attorneys for Executive Committee of
  Association of Parishes
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S
SECOND AMENDED PLAN - 55
291/526062.46
030707 1144/62174.00001